# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

AMERICAN AIRLINES, INC.,

               Plaintiff,

v.

DESPEGAR.COM USA, INC., *et al.*,

               Defendants.

DESPEGAR.COM USA, INC.,

               Counterclaim Plaintiff,

v.

AMERICAN AIRLINES, INC.,

               Counterclaim Defendant.

Case No.: 13-22773-CV-ALTONAGA

**ANSWER OF DEFENDANTS DESPEGAR.COM USA, INC.; DESPEGAR.COM.AR S.A.; DECOLAR.COM, LTDA; DESPEGAR.COM MEXICO, S.A. DE C.V.; DESPEGAR.COM CHILE S.A.; DESPEGAR.COM PERÚ SAC; SERVICIOS ONLINE 3351 DE VENEZUELA, C.A.; AND TRAVEL RESERVATIONS S.R.L.**

**COUNTERCLAIM OF DESPEGAR.COM USA, INC.**

**JURY TRIAL DEMANDED**

## ANSWER

      Defendants Despegar.com USA, Inc. ("Despegar USA"); Despegar.com.ar S.A. ("Despegar Argentina"), Decolar.com, Ltda ("Despegar Brazil"), Despegar.com Mexico, S.A. de C.V. ("Despegar Mexico"), Despegar.com Chile S.A. ("Despegar Chile"), Despegar.com Perú SAC ("Despegar Peru"), Servicios Online 3351 de Venezuela, C.A. ("Despegar Venezuela"), and Travel Reservations S.R.L. ("Despegar Uruguay") (collectively, "Defendants"),[1] by and through their undersigned attorneys, for their Answer and Affirmative Defenses to the Complaint of Plaintiff American Airlines, Inc. ("Plaintiff"), filed August 1, 2013, state and allege as follows:

---

[1]  Defendant Despegar.com Spain has not been served with the Complaint. The proper names of each remaining Defendant, as reflected above, are disclosed in Defendants' Certificate of Interested Parties and Corporate Disclosure Statement [ECF No. 20]

1.      Defendants state that Paragraph 1 states legal conclusions to which no response is required, but to the extent a response is required, Defendants deny any alleged violation of the Lanham Act, 15 U.S.C. § 1125, unfair competition, or Florida law.

2.      Defendants state that Paragraph 2 states legal conclusions to which no response is required, but to the extent a response is required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 2 and on that basis deny such allegations.

3.      Defendants deny the allegations of Paragraph 3 of the Complaint.

4.      Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 4 and on that basis deny such allegations.

5.      Defendants admit the first and second sentences of Paragraph 5 of the Complaint. Defendants otherwise deny the allegations of Paragraph 5 of the Complaint.

6.      Defendants state that Defendant Travel Reservations S.R.L. is based in Uruguay with offices at Ruta 8 Km 17,500, Edificio Synergia, Oficina 101, Zonamerica, Montevideo 1600 UY.  Defendants otherwise deny the allegations of Paragraph 6 of the Complaint.

7.      Defendants state that Defendant Despegar.com.ar S.A. is based in Argentina with offices at Boulevard Corrientes 587, Floor 3, Buenos Aires, Federal Capital Cl043ADS. Defendants otherwise deny the allegations of Paragraph 7 of the Complaint.

8.      Defendants state that Defendant Decolar.com, Ltda. is based in Brazil with offices at Rua Timóteo Penteado, 1578, Vila Hulda, Guarulhos, São Paulo.  Defendants otherwise deny the allegations of Paragraph 8 of the Complaint.

9.      Defendants state that Defendant Despegar.com Chile S.A. is based in Chile with offices at Luis Thayer Ojeda 086, Piso 3, Providencia, Santiago.  Defendants otherwise deny the allegations of Paragraph 9 of the Complaint.

10.      Defendants state that Defendant Despegar.com Mexico, S.A. de C.V. is based in Mexico with offices at Avenida Ejercito Nacional, No. 373, piso 9, Granada, Distrito Federal. Defendants otherwise deny the allegations of Paragraph 10 of the Complaint.

11.      Defendants state that Defendant Despegar.com Perú SAC is based in Peru with offices at Offices at Amador Merino Reyna N° 307, Depto. 801, San Isidro, Lima.  Defendants otherwise deny the allegations of Paragraph 11 of the Complaint.

12.      Defendants state that Defendant Servicios Online 3351 de Venezuela, C.A. is based in Venezuela with offices at Avenida Francisco de Miranda, Edificio Parque Cristal, Torre Oeste, Piso 3, oficina 3, Los Palos Grandes, Caracas.  Defendants otherwise deny the allegations of Paragraph 12 of the Complaint.

13.      Defendants deny the allegations of Paragraph 13 of the Complaint.

14.      Defendants state that Paragraph 14 states legal conclusions to which no response is required, but to the extent a response is required, Defendants state that Plaintiff's claims are brought pursuant to under 15 U.S.C. § 1121 and 28 U.S.C. §§ 1338(a), (b), and 1367.

15.      Defendants admit that Despegar USA is located in this judicial district and transacts business in this judicial district.  Defendants deny that Despegar Argentina, Despegar Brazil, Despegar Mexico, Despegar Chile, Despegar Peru, Despegar Venezuela, or Despegar Uruguay are located in this judicial district or transact business in this judicial district. Defendants deny the remaining allegations of Paragraph 15 of the Complaint.

16.     Defendants deny the allegations in the first sentence of Paragraph 16 of the Complaint.  Except as specifically admitted, Defendants deny the allegations contained in subparts (a) through (i) of Paragraph 16 of the Complaint.

(a)     Defendants state that more than one Defendant share Mariano Fiori as a common officer, and that Mr. Fiori is president of Despegar USA.  Defendants deny the remaining allegations of Paragraph 16(a) of the Complaint.

(b)     Defendants deny the allegations of Paragraph 16(b) of the Complaint.

(c)     Defendants deny the allegations of Paragraph 16(c) of the Complaint.

(d)     Defendants admit that Despegar USA has obtained sales from Florida residents who purchased airline tickets through the website http://www.us.despegar.com. Defendants deny the remaining allegations of Paragraph 16(d) of the Complaint.

(e)     Defendants deny the allegations of Paragraph 16(e) of the Complaint.

(f)     Defendants deny the allegations of Paragraph 16(f) of the Complaint.

(g)     Defendants deny the allegations of Paragraph 16(g) of the Complaint.

(h)     Defendants state that Despegar USA derives revenues from Florida residents who purchase airline tickets through the website http://www.us.despegar.com, and that Despegar USA directs marketing efforts in Florida.  Defendants deny remaining the allegations of Paragraph 16(h) of the Complaint.

(i)     Defendants deny the allegations of Paragraph 16(i) of the Complaint.

17.     Defendants deny the allegations of Paragraph 17 of the Complaint.

18.     Defendants state that Despegar USA carries on a business in Florida, and otherwise deny the allegations of Paragraph 18 of the Complaint.

19.     Defendants state that Paragraph 19 states legal conclusions to which no response is required, but to the extent a response is required, Defendants state that Despegar USA conducts business in this district and otherwise deny the allegations in Paragraph 19 of the Complaint.

20.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 20 and on that basis deny such allegations.

21.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 21 and on that basis deny such allegations.

22.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 22 and on that basis deny such allegations.

23.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 23 and on that basis deny such allegations.

24.     Defendants state that Paragraph 24 states legal conclusions to which no response is required, but to the extent a response is required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 24 and on that basis deny such allegations.

25.     Defendants state that Paragraph 25 states legal conclusions to which no response is required, but to the extent a response is required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 25 and on that basis deny such allegations.

26.     Defendants state that Paragraph 26 states legal conclusions to which no response is required, but to the extent a response is required, Defendants lack knowledge or information

sufficient to form a belief as to the truth of the allegations of Paragraph 26 and on that basis deny such allegations.

27.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 27 and on that basis deny such allegations.

28.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 28 and on that basis deny such allegations.

29.     Defendants state that Paragraph 29 states legal conclusions to which no response is required, but to the extent a response is required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 29 and on that basis deny such allegations.

30.     Defendants state that Paragraph 30 states legal conclusions to which no response is required, but to the extent a response is required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 30 and on that basis deny such allegations.

31.     Defendants state that Paragraph 31 states legal conclusions to which no response is required, but to the extent a response is required, Defendants deny that they have committed the unlawful acts alleged by Plaintiff.  Defendants otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 31 and on that basis deny such allegations.

32.     Defendants state that certain Defendants operate certain individual travel websites, all of which are accessible through http://www.despegar.com, which functions as a portal of an online travel agency.  Defendants further state that certain press materials have stated: (1) "Despegar.com is the largest travel agency in Latin America"; and (2) "the company"

is "[b]ased in Miami and with presence in 21 countries throughout the Latin American region and the US."  To the extent that Paragraph 32 purports to quote directly from certain materials, Defendants refer the Court to those materials for the full context in which they appear. Defendants otherwise deny the allegations of Paragraph 32 of the Complaint.

33.     Defendants state that certain Defendants operate certain individual travel websites, all of which are accessible through http://www.despegar.com, which functions as a portal of an online travel agency.  Defendants further state that the individual websites accessible through http://www.despegar.com help travelers by sorting through vast amounts of information and then providing a traveler with options for air travel, accommodations, and other services. Defendants otherwise deny the allegations of Paragraph 33 of the Complaint.

34.     Defendants state that Despegar USA uses its own website, located at http://www.us.despegar.com, to target Florida residents and that Despegar USA derives revenues from Florida residents.  Defendants otherwise deny the allegations of Paragraph 34 of the Complaint.

35.     Defendants deny the allegations of Paragraph 35 of the Complaint. Defendants state that it is their policy to charge fees for bookings on American Airlines flights comparable to fees for bookings on other, similarly situated flights.

36.     Defendants deny the allegations of Paragraph 36 of the Complaint.

37.     Defendants deny the allegations of Paragraph 37 of the Complaint.

38.     Defendants deny the allegations of Paragraph 38 of the Complaint. Defendants state that it is their policy to charge fees for tickets booked on American Airlines flights through their websites comparable to fees for tickets booked on other, similarly situated carriers for similar travel.

39.     Defendants state that Defendants' websites include a best price guarantee. Defendants deny the remaining allegations of Paragraph 39 of the Complaint.

40.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 40 and on that basis deny such allegations.

41.     Defendants deny the allegations of Paragraph 41 of the Complaint.

42.     Defendants deny the allegations of Paragraph 42 of the Complaint.

43.     Defendants deny the allegations of Paragraph 43 of the Complaint.

44.     Defendants deny the allegations of Paragraph 44 of the Complaint.

45.     Defendants deny the allegations of Paragraph 45 of the Complaint.

46.     Defendants deny the allegations of Paragraph 46 of the Complaint.

47.     Defendants state that Paragraph 47 states legal conclusions to which no response is required, but to the extent a response is required, Defendants deny the allegations of Paragraph 47 of the Complaint.

48.     Defendants deny the allegations of Paragraph 48 of the Complaint.

49.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 49 and on that basis deny such allegations.

50.     Defendants state that Paragraph 50 states legal conclusions to which no response is required, but to the extent a response is required, Defendants deny the allegations of Paragraph 50 of the Complaint.

## <u>COUNT I</u>
**(Alleged Violation of Lanham Act, 15 U.S.C. § 1125(a); Alleged False Advertising)**

51.     Defendants refer to and incorporate by reference their responses to Paragraphs 1-50 of the Complaint.

52.     Defendants state that Paragraph 52 states legal conclusions to which no response is required, but to the extent a response is required, 15 U.S.C. § 1125(a) speaks for itself.

53.     Defendants deny the allegations of Paragraph 53 of the Complaint.

54.     Defendants deny the allegations of Paragraph 54 of the Complaint.

55.     Defendants deny the allegations of Paragraph 55 of the Complaint.

56.     Defendants state that Paragraph 56 states legal conclusions to which no response is required, but to the extent a response is required, Defendants admit that Despegar USA solicits customers in interstate commerce, and otherwise deny the allegations of Paragraph 56 of the Complaint.

57.     Defendants deny the allegations of Paragraph 57 of the Complaint.

58.     Defendants deny the allegations of Paragraph 58 of the Complaint.

59.     Defendants deny the allegations of Paragraph 59 of the Complaint.

### COUNT II
**(Alleged Violation of Lanham Act, 15 U.S.C. § 1125(c); Alleged Dilution by Tarnishment)**

60.     Count II was dismissed by the Court in its Order dated November 11, 2013 [ECF No. 24].  Thus, Paragraph 60 does not require a response.  To the extent a response is required, Defendants refer to and incorporate by reference their responses to Paragraphs 1-50 of the Complaint.

61.     Count II was dismissed by the Court in its Order dated November 11, 2013 [ECF No. 24].  Thus, Paragraph 61 does not require a response.  To the extent a response is required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 61 of the Complaint and on that basis deny such allegations.

62.     Count II was dismissed by the Court in its Order dated November 11, 2013 [ECF No. 24].  Thus, Paragraph 66 does not require a response.  To the extent a response is required, Defendants deny the allegations of Paragraph 62 of the Complaint.

63.     Count II was dismissed by the Court in its Order dated November 11, 2013 [ECF No. 24].  Thus, Paragraph 63 does not require a response.  To the extent a response is required, Defendants deny the allegations of Paragraph 63 of the Complaint.

64.     Count II was dismissed by the Court in its Order dated November 11, 2013 [ECF No. 24].  Thus, Paragraph 64 does not require a response.  To the extent a response is required, Defendants deny the allegations of Paragraph 62 of the Complaint.

65.     Count II was dismissed by the Court in its Order dated November 11, 2013 [ECF No. 24].  Thus, Paragraph 65 does not require a response.  To the extent a response is required, Defendants deny the allegations of Paragraph 65 of the Complaint.

66.     Count II was dismissed by the Court in its Order dated November 11, 2013 [ECF No. 24].  Thus, Paragraph 66 does not require a response.  To the extent a response is required, Defendants deny the allegations of Paragraph 66 of the Complaint.

## <u>COUNT III</u>
### (Alleged Common Law Unfair Competition)

67.     Defendants refer to and incorporate by reference their responses to Paragraphs 1-50 of the Complaint.

68.     Defendants deny the allegations of Paragraph 68 of the Complaint.

69.     Defendants deny the allegations of Paragraph 69 of the Complaint.

70.     Defendants deny the allegations of Paragraph 70 of the Complaint.

<u>COUNT IV</u>
**(Alleged Violation of Florida's Deceptive And Unfair Trade Practices Act)**

71.     Defendants refer to and incorporate by reference their responses to Paragraphs 1-50, 53-59, 57 and 62 of the Complaint.

72.     Defendants deny the allegations in the second sentence of Paragraph 72 of the Complaint.  The first sentence Paragraph 72 states legal conclusions to which no response is required, but to the extent a response is required, Defendants deny the allegations in the first sentence of Paragraph 72 of the Complaint.

73.     Defendants state that Paragraph 73 states legal conclusions to which no response is required, but to the extent a response is required, Florida Statute § 501.202 speaks for itself.

74.     Defendants state that Paragraph 74 states legal conclusions to which no response is required, but to the extent a response is required, Florida Statute § 501.203 speaks for itself.

75.     Defendants state that Paragraph 75 states legal conclusions to which no response is required, but to the extent a response is required, 49 U.S.C. §  41712 and 14 C.F.R. § 399.84 speak for themselves.

76.     Defendants state that Paragraph 76 states legal conclusions to which no response is required, but to the extent a response is required, Defendants deny the allegations of Paragraph 76 of the Complaint.

77.     Defendants deny the allegations of Paragraph 77 of the Complaint.

78.     Defendants deny the allegations of Paragraph 78 of the Complaint.

79.     Paragraph 79 states legal conclusions to which no response is required, but to the extent a response is required, Florida Statutes §§ 599.926 *et seq.*, 599.9334, and 599.9335 speak for themselves.

80.     Paragraph 80 states legal conclusions to which no response is required, but to the extent a response is required, Florida Statute § 599.934 speaks for itself.  Defendants otherwise deny the allegations of Paragraph 80 of the Complaint.

81.     Defendants deny the allegations of Paragraph 81 of the Complaint.

82.     Defendants deny the allegations of Paragraph 82 of the Complaint.

**COUNT V**
**(Alleged Conspiracy To Violate The Lanham Act)**

83.     Defendants refer to and incorporate by reference their responses to Paragraphs 1-50, 53-59, 57 and 62 of the Complaint.

84.     Defendants deny the allegations of Paragraph 84 of the Complaint.

85.     Defendants deny the existence of an illegal conspiracy, or that they committed any overt acts in further of such a conspiracy.  The remaining allegations of Paragraph 85 state legal conclusions to which no response is required, but to the extent a response is required, Defendants deny the remaining allegations of Paragraph 85 of the Complaint.

86.     Defendants deny the allegations of Paragraph 86 of the Complaint.

**COUNT V**
**(Alleged Conspiracy To Commit Unfair Competition)**

87.     Defendants refer to and incorporate by reference their responses to Paragraphs 1-50, 53-59, 57 and 62 of the Complaint.

88.     Defendants deny the allegations of Paragraph 88 of the Complaint.

89.     Defendants deny the existence of an illegal conspiracy, or that they committed any overt acts in further of such a conspiracy.  The remaining allegations of Paragraph 89 state legal conclusions to which no response is required, but to the extent a response is required, Defendants deny the remaining allegations of Paragraph 89 of the Complaint.

90.     Defendants deny the allegations of Paragraph 90 of the Complaint.

## COUNT VII
**(Alleged Conspiracy To Violate Florida's Deceptive And Unfair Trade Practices Act)**

91.     Defendants refer to and incorporate by reference their responses to Paragraphs 1-50, 53-59, 57 and 62 of the Complaint.

92.     Defendants deny the allegations of Paragraph 92 of the Complaint.

93.     Defendants deny the existence of an illegal conspiracy, or that they committed any overt acts in further of such a conspiracy.  The remaining allegations of Paragraph 93 state legal conclusions to which no response is required, but to the extent a response is required, Defendants deny the remaining allegations of Paragraph 93 of the Complaint.

94.     Defendants deny the allegations of Paragraph 94 of the Complaint.

## PRAYER FOR RELIEF

Defendants state that the PRAYER FOR RELIEF section of the Complaint does not contain any allegations that require a response, but to the extent a response is required, Defendants deny the allegations contained in the PRAYER FOR RELIEF, deny that Plaintiff is entitled to any of the relief sought in the Complaint against Defendants, and request that the Court deny any and all such relief to Plaintiff in its entirety and with prejudice and that Plaintiff take nothing.

*     *     *

To the extent not expressly addressed above, the allegations in the Complaint are denied. In addition, the headings in the Complaint do not present allegations for which a response is required, but to the extent any heading contains allegations requiring a response, Defendants deny such allegations.

## AFFIRMATIVE DEFENSES

Defendants allege and assert the following Affirmative Defenses in response to the allegations of the Complaint.  By asserting such Affirmative Defenses, Defendants do not agree or concede that any of the following defenses must be pled as affirmative defenses, and do not agree or concede that they bear the burden of proof or the burden of persuasion on any of these issues, in whole or in part.  Defendants reserve the right to amend their Answer, or assert additional Affirmative Defenses, as additional information becomes available and/or is discovered.

### FIRST AFFIRMATIVE DEFENSE
(Failure to State a Claim)

Plaintiff's claims are barred, in whole or in part, to the extent that the Complaint fails to state a claim upon which relief may be granted.

### SECOND AFFIRMATIVE DEFENSE
(Lack of Personal Jurisdiction)

Plaintiff's claims are barred, in whole or in part, to the extent that the Court lacks personal jurisdiction over Defendants Despegar Argentina, Despegar Brazil, Despegar Mexico, Despegar Chile, Despegar Peru, Despegar Venezuela, and Despegar Uruguay.

### THIRD AFFIRMATIVE DEFENSE
(Laches)

Plaintiff's claims are barred, in whole or in part, by the doctrine of laches.

### FOURTH AFFIRMATIVE DEFENSE
(Equitable Estoppel, Consent, Waiver, Acquiescence)

Plaintiff's claims are barred, in whole or in part, by the doctrines of equitable estoppel, consent, waiver, and acquiescence.

## FIFTH AFFIRMATIVE DEFENSE
(Unclean Hands)

On information and belief, Plaintiff's claims are barred, or its claims for recovery are limited, in whole or in part, by the doctrine of unclean hands.

## SIXTH AFFIRMATIVE DEFENSE
(Fair Use)

Plaintiff's claims are barred, or its claims for recovery are limited, in whole or in part, by the doctrine of fair use, including but not limited to nominative fair use.

## SEVENTH AFFIRMATIVE DEFENSE
(Actions of Others)

On information and belief, Plaintiff's claims are barred, or its claims for recovery are limited, in whole or in part, because Defendants are not liable for the acts of others over whom they have no control.

## EIGHTH AFFIRMATIVE DEFENSE
(Trademark Exhaustion and First Sale Doctrine)

Plaintiff's claims are barred, or its claims for recovery are limited, in whole or in part, by trademark exhaustion and/or the first sale doctrine.

## NINTH AFFIRMATIVE DEFENSE
(Trademark Misuse)

Plaintiff's claims are barred, or its claims for recovery are limited, in whole or in part, because Plaintiff used its trademark rights, if any, to unfairly extend its monopoly and suppress lawful competition.

## TENTH AFFIRMATIVE DEFENSE
(Non-Willfulness and Innocence)

Plaintiff's claims are barred, or its claims for recovery are limited, in whole or in part, because Defendants acted innocently and without willfulness.

## ELEVENTH AFFIRMATIVE DEFENSE
(Statute of Limitations)

Plaintiff's claims are barred, or its claims for recovery are limited, in whole or in part, to the extent that Plaintiff has failed to file its claims within the applicable statute of limitations.

## TWELFTH AFFIRMATIVE DEFENSE
(No Damages)

If any remedy is appropriate, Plaintiff is not entitled to any damages because: (1) Plaintiff has not suffered any damages or economic harm as a result of the matters alleged in the Complaint; (2) Defendants have not cause any damages or economic harm to Plaintiff; and/or (3) Plaintiff's claims for damages are uncertain, contingent, and speculative.

## THIRTEENTH AFFIRMATIVE DEFENSE
(No Injunctive Relief)

If any remedy is appropriate, Plaintiff is not entitled to any injunctive relief because any alleged injury to Plaintiff is not immediate or irreparable, the balance of hardships and public interest weigh against the grant of an injunction, and Plaintiff has an adequate remedy at law.

---------------------

## **COUNTERCLAIM**

In accordance with Rule 13 of the Federal Rules of Civil Procedure, and by way of this Counterclaim ("Counterclaim") against Counterclaim Defendant American Airlines, Inc. ("AA"), Counterclaim Plaintiff Despegar.com USA, Inc. ("Despegar USA") refers to and incorporates by reference its responses to Paragraphs 1-94 of the Complaint filed by AA on August 1, 2013 and its Affirmative Defenses.

In this Counterclaim, Despegar USA hereby asserts counterclaims against AA under Section 2 of the Sherman Act, 15 U.S.C. § 2 and for defamation. In support of its counterclaims, Despegar USA alleges as follows:

16

## OVERVIEW OF THE ACTION

1.      AA is engaged in an ongoing anticompetitive scheme to marginalize and eliminate online travel agencies ("OTAs") such as Despegar USA and its sister subsidiaries that together make up the Despegar.com and Decolar.com brand (collectively "Despegar"), which consume AA tickets and compete with AA in the sale of airline tickets to the traveling public.

2.      For decades, until the advent of the Internet and the emergence of OTAs, travelers shopped for airline tickets in an opaque market in which it was often difficult to efficiently compare prices across airlines.  Major airlines, such as AA, made enormous profits in that market and were able to charge ticket prices that were in many cases not subjected to vigorous price competition.  While these airlines were supposed to compete against each other, the absence of an efficient and accessible way for consumers to compare ticket prices allowed airlines like AA to charge inflated prices.

3.      That changed with the emergence of OTAs like Despegar USA.  OTAs, like a brick-and-mortar travel agent, help travelers identify and book the best available fares for their desired itineraries.  Instead of working through a travel agent in person or over the phone, however, OTAs allow travelers to access flight information and book flights through a website. These OTA websites offer a key advantage over brick-and-mortar travel agents or airline-specific websites: travelers are easily able to compare the airfares of multiple airlines at the same time, and sort those airfares by price and other metrics.  OTAs like Despegar USA have become immensely popular because most travelers select flights based on price, and OTAs allow travelers to access the latest pricing information offered by airlines on any conceivable route or route combination and, most importantly, to compare fares transparently across all airlines.

4.      Despegar is one of the largest OTAs and is *the* largest OTA in Latin America. Despegar has painstakingly built its business over the years and has grown to be a significant player providing access to flights, in particular, between the U.S. and Latin America.  Despegar USA serves thousands of travelers flying between the United States and Latin American cities, as well as U.S. travelers flying domestically and between Latin American cities.

5.      The advent of OTAs like Despegar USA has been one of the most significant, procompetitive developments for airline travelers of the past two decades.  OTAs have significantly increased price transparency in the travel industry, stimulated competition amongst the airlines, and facilitated entry into the market for new competitors—especially airlines, sometimes referred to as "low cost carriers," which have found ways to offer airline travel at lower costs than the legacy airlines like AA.  This is great for travelers, but it has proven to be a bad development for some legacy carriers—and, in particular, the advent of robust price competition has been especially hard on AA.

6.      With the emergence of OTAs, the past decade has proven that AA is unable to compete on the merits against other airlines by providing the travel services passengers want at competitive prices.  AA has not been an efficient airline and has had great difficulty competing on the merits in an era of robust price competition.  Burdened with high labor and fuel costs, as well as inefficient, old aircrafts, AA proved unable to compete with upstart airlines and even its major competitors on price.  When the market for ticket sales was opaque, this was less of a problem: travelers could not as easily shop among airlines and compare prices.  But when price transparency increased, AA was suddenly unable to compete.

7.      As AA's own Chief Restructuring Officer testified in the company's recent bankruptcy proceeding, the "new transparency in pricing brought about by the advent of on-line

18

fare displays" created "a competitive landscape" that caused AA's "financial fortunes [to] reverse[] and deteriorate[]."  AA "has learned from bitter experience that if it fails to match fares on a route with lower cost competition, it loses traffic and the route becomes less profitable or more unprofitable."

8.     AA has tried to compete with other airlines, divert travelers to its website, entice travelers with frequent flyer miles, and encourage ticket sales by packaging them with other products (such as more-space seats or an extra bag), but these efforts have largely been unsuccessful.

9.     Nostalgic for the days of opaque pricing and an uncompetitive landscape, AA has pursued a plan to use its still formidable market power in many areas of air travel to turn back time and remove the transparency and price competition that now characterize the market.  As an AA senior executive told the *Wall Street Journal*, AA is "committed to a *wholesale shake-up* of its distribution strategy" with the aim of seeing "all travel agency volume going through" AA's website.  AA's strategy to achieve that "shake-up" is to fragment the ticket sale market and marginalize or remove OTAs from the distribution business.  AA has pursued this plan to diminish competition so it can succeed where it would not otherwise be able to do so.

10.     The goal of this shake-up is straightforward and anticompetitive: AA wants to diminish price competition so it can charge travelers higher prices.

11.     AA attempted this "shake-up" by convincing travelers to use its website through advertising.  But because AA.com does not allow comparisons of price across airlines, consumers were not very interested.  AA then tried to negotiate arrangements with OTAs whereby the OTAs would replace the procompetitive distribution technology of the current market with an AA-centric technology—called "AA Direct Connect"—which would process

travelers' purchases of AA flights on OTAs directly through the AA website.  But AA Direct Connect was not able to compete on its own merits, and OTAs were generally not interested in an arrangement that would inhibit price comparison across airlines.  AA failed to appreciate how valuable the current distribution system is to consumers and OTAs and how, by contrast, limited the AA Direct Connect offering is.  AA, in fact, approached Despegar about signing up for AA Direct Connect in early 2013, just months before it sued Despegar and its subsidiaries, including Despegar USA, in this action.  But Despegar, like many OTAs, declined to adopt AA Direct Connect.

12.     Unable to convince travelers to purchase flights through AA.com, AA has attempted to "shake-up" the travel industry by engaging in a pattern of anticompetitive conduct aimed at eliminating competition between airlines and the distribution of airline content.  AA's principal strategy has been to use its own market power (which has only grown with its recent merger with US Airways) as a weapon.  Despite the fact that AA's flights have been offered through Despegar USA and other OTAs for years, AA has pulled all of its content from Despegar USA and other OTAs in an effort to starve those OTAs of travelers.  By precluding Despegar USA and other OTAs from carrying AA flights, AA diverts away from the OTAs travelers that want to fly on AA or *need* to fly on AA because they are locked into AA's frequent flyer program or because AA is the only airline that provides service for their desired route.

13.     AA's strategy is particularly devastating for travelers wishing to fly city-to-city routes that are only offered by AA or for which AA has a large market share.  Under such circumstances, if a customer wishes to fly at all, he or she must abandon the OTA for which AA has pulled its content.  After AA has pulled its flights, the OTAs are left with few if any flights to offer travelers on particular routes.  Despegar USA, for example, has historically sold many

tickets for routes that are *only* covered by AA.  In fact, AA dominates many of the city-to-city routes in Latin America or between Latin America and U.S. cities, and has used its position to marginalize Despegar USA.  AA knows full well that by cutting Despegar USA off from its content, those travelers flying AA-dominated routes will stop using Despegar USA and Despegar USA will suffer financial harm as a result.

14.     In addition to taking action to marginalize or eliminate Despegar USA and other OTAs by refusing to deal with them, AA has also sought to cut off the sources that feed them: global distribution systems ("GDSs").  GDSs are the intermediaries between OTAs and airlines that aggregate flight information across airlines.  GDSs link directly to airlines' reservation systems and enable travel agents with a single connection to a GDS to book flights with all of the airlines.  GDSs also offer OTAs competitive rates of compensation for their distribution services, which enables OTAs to offer lower fees to travelers.

15.     In order to fragment the market for airline tickets, AA has also sought to eliminate or greatly impair the GDSs  provide the technology and content that drives Despegar USA's and other OTAs' ability to provide transparent fare information to travelers.  By taking these steps, AA has sought to ensure that OTAs can only receive air travel information directly from AA, if at all, and no longer through GDSs.

16.     These acts have not been without loss to AA.  In the first quarter of 2011 when AA withdrew all of its content from Orbitz—the first and largest OTA—it lost over $50 million in revenue.  But AA has always believed that if it can sufficiently fragment the market and eliminate or marginalize OTAs, in the long term it can recoup lost revenue by charging supracompetitive prices for its tickets.  AA's experience with Orbitz confirms as much: when AA pulled its content from Orbitz, Orbitz's market capitalization plunged dramatically.  By now

pulling its content from OTAs like Despegar USA, AA hopes for the same result.  It intends to steer travelers directly to AA's website, put those OTAs out of business, and/or force those OTAs to negotiate new distribution agreements with AA that will significantly burden the OTAs and further AA's anticompetitive ends.

17.     If AA succeeds in the last of those aims, it will force the OTAs to replace the procompetitive distribution technology of the GDSs with AA Direct Connect, which will burden OTAs with additional costs while impeding price transparency for travelers and facilitating AA's ability to force price discrimination on travelers.  In the process, AA plans to bully the OTAs into agreements that will remove commissions that AA currently pays in the existing distribution structure, and may even require payment by the OTAs to sell AA flights.  These are not hollow threats or idle speculation.  AA has made clear to OTAs that they must either accept its terms or face elimination.

18.     Further, as retaliation for Despegar's refusal to adopt Direct Connect, AA published false and defamatory claims on its website accusing Despegar of unfair and imprecise pricing practices.  This material was disseminated with the intent of injuring Despegar's and its subsidiaries', including Despegar USA's, reputation and relationships with travelers, GDSs and other airlines.

19.     Despegar USA brings these counterclaims to bring to an end AA's anticompetitive scheme, recover damages for harm suffered as a result of the scheme, and to restore and protect competition in the provision of air travel services and the distribution of airline content.  Further, Despegar USA brings claims for defamation to recover for damages suffered as a result of AA's false and defamatory statements.

## PARTIES

20.     Counterclaim Plaintiff Despegar.com USA, Inc. is a corporation organized and existing under the laws of the State of Delaware.  Despegar.com USA, Inc. is a corporation registered to conduct business in the State of Florida and maintains a principal place of business at 14 N.E. 1st Avenue, Suite 516, Miami, Florida 33132.

21.     Counterclaim Defendant American Airlines, Inc. is a corporation organized and existing under the laws of the State of Delaware with a principal place of business at 4333 Amon Carter Boulevard, Fort Worth, Texas 76155.

## JURISDICTION AND VENUE

22.     Despegar USA's counterclaims against AA arise under Section 2 of the Sherman Act, 15 U.S.C. § 2, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.  This Court has subject matter jurisdiction over these counterclaims under 28 U.S.C. §§ 1331 and 1337.

23.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (c) as unlawful practices are alleged to have occurred in this federal judicial district and AA resides and regularly conducts business in this district.

24.     This Court has personal jurisdiction over AA by way of the fact that AA does business in the State of Florida and consented to jurisdiction by filing the Complaint.

## FACTUAL ALLEGATIONS

**A.      Historical Origins of the Market for Airline Tickets**

25.     Commercial airlines first emerged in the United States roughly one hundred years ago.  Airlines such as AA—which was founded in the 1930s—have long distributed tickets to travelers both directly and through travel agencies.  While travel agencies have traditionally

charged airlines commissions on the sale of tickets, airlines have relied on travel agencies to market and sell to travelers.

26.     Before the advent of the Internet, airline tickets were sold directly to travelers over the telephone or at an airline's ticket counter.  Under those circumstances, travelers had few options for shopping around for the best fare.  Even savvy customers were limited to walking from ticket counter to ticket counter or calling multiple airlines to try to find the best price. Shopping for the best fare took time, and often airlines would not have comparable flights or fares would change.  As a result, especially with the airlines' creation of frequent flyer programs, most travelers would pick a single, preferred airline and pay the fare that airline was charging.

27.     Travel agencies offered travelers more options.  Before the Internet, travelers could visit a brick-and-mortar travel agency or call a travel agent over the telephone.  A travel agent would have to independently look up the flight, call an airline, write a ticket manually, and complete the related accounting unassisted.

28.     In the 1970s, airlines set up global distribution systems (GDSs), which are computer systems that aggregate information about flights and deliver them to travel agents. Airlines believed the GDSs would better facilitate the distribution of flight information to travel agents: travel agents would no longer need to contact airlines for schedule, fare, and availability information; instead, that information would be delivered to the travel agents.

29.     Many of the airlines owned their own GDSs.  AA created a GDS known as Sabre; several foreign airlines founded Amadeus; Travelport, which operates using the trademarks Galileo, Apollo, and Worldspan, evolved from systems created by United, Delta, TWA, Northwest, and certain European carriers.  These GDSs altered the landscape for purchasing tickets.  By delivering more information to travel agents, travel agents were better able to

24

facilitate fare comparison for their travelers.  But at the same time, the airlines also used their GDSs to engage in "display bias"—that is, in responding to a query regarding a travel itinerary, a GDS would display the flight options of the airline owning the GDS first, even if another airline offered lower fares or more direct services.  For example, a travel agent requesting fares through Sabre would receive a display of flight options with AA flights on top.

30.    Airline-owned GDSs allowed major airlines to capture greater market share.  As Robert Crandall, President of AA in 1983, testified to Congress, "The preferential display of our flights, and the corresponding increase in our market share, is the competitive *raison d'être* for having created the system in the first place."  By maintaining their own GDSs, airlines were able to push particular flights to travel agents, effectively controlling the competitive landscape.  Such a system favored major, established airlines that owned GDSs, to the detriment of smaller, upstart airlines that might be able to offer better fares but could not effectively relay their content to travel agents.

31.    Economic evidence from this period of time confirms the absence of fierce competition for the sale of airline tickets.  There was no way for consumers easily to compare flights and fares across airlines.  Brick-and-mortar travel agents, while at least able to compare flights across airlines, were at the mercy of airline-controlled GDSs.  These travel agents often were delivered flight listings marked by display bias, and would deliver options to consumers that did not reflect best possible pricing.  Moreover, these travel agents rarely had flight options for smaller, upstart airlines that were cost-competitive but did not own or have access to GDSs. The result was that consumers paid higher airfares and the airlines profited.

B.      **The Emergence of OTAs and Price Transparency**

32.     All of that changed with the advent of the Internet, which dramatically transformed the market for the sale of airlines tickets in a number of ways.  Airlines rolled out airline-specific websites, such as AA.com, to sell tickets directly to travelers online.  These websites showed airline routes, fares and availability, and allowed travelers to purchase flights directly through the website.  The websites also allowed the airlines to grow their frequent flyer programs by offering promotions on their websites and storing frequent flyers' personal information.

33.     As airlines were introducing their own websites, they were also spinning off the GDSs they once owned.  The Department of Transportation had regulated GDSs heavily following the rampant display biasing in the 1980s.  Because of that regulation, and because airlines believed that their own websites could replace a lot of the volume from GDSs, they divested themselves of these businesses.  In fact, because airline websites were able to connect travelers directly with an airline's own reservation system, bypassing GDSs, the airlines had significant leverage—for at least a time—when negotiating with the newly independent GDSs.  However, ultimately no longer beholden to the airlines, these GDSs facilitated the emergence of new competitors for the airlines.

34.     OTAs emerged in the mid- to late-1990s, around the same time that airlines launched websites.  Not restricted to brick-and-mortar or corporate travel agents, the OTAs, like airline-specific websites, provide an online platform through which the general public can search for and book flights.  OTAs offer a key advantage over airline-specific websites, moreover, in that they allow consumers to efficiently compare the products and services of multiple travel suppliers and purchase those that best suit their needs.  OTAs—like traditional travel agencies—

aim to assist travelers in identifying and booking the *best available fares* for their desired itineraries.  OTAs also have the added benefit of offering multi-airline itineraries, which are generally not available through airline-specific websites.

35.     The emergence and growth of OTAs were fueled in part by independent GDSs. An OTA will generally enter an agreement with one or more GDS pursuant to which the GDS provides the OTA with access to the aggregated information.  Like traditional travel agencies, OTAs use GDSs to provide the user with schedule, fare, and other information.  Thus, when a consumer uses an OTA to search for travel options, the consumer is actually searching through the information collected by GDSs.  OTAs also complete bookings through GDSs.  For these services, GDSs generally are compensated by airlines based on the number of flight segments sold.

36.     AA, like virtually every other airline, has historically entered into long-term agreements to provide its "full content" to GDSs for distribution across the industry, including to OTAs.  This was done to ensure that AA flights were available everywhere a traveler sought to access them.  As a result, AA flights have been widely sold through OTAs.

37.     The development of OTAs revolutionized the distribution of airline tickets.  For the first time, travel agencies could process a large number of transactions quickly, efficiently, and reliably.  OTAs enable travelers to minimize the time and cost associated with searching for and booking a flight, comparison shop to ensure the best overall value proposition for a traveler's needs, and control and manage the cost of travel procurement.  A traveler using an OTA can compare competing airlines' routes, schedules, fares, and availability; book the itinerary that best suits the needs of the customer; select seats; identify and book hotel, car rental, and other travel products and services, and more—all quickly and efficiently, with one convenient tool.

27

38.     By providing an online platform through which the general public can efficiently shop for fares themselves, OTAs dramatically enhanced transparency.  The result of this increased fare transparency was to force airlines to compete more aggressively on price, resulting in benefits to travelers.

39.     The effects of OTAs on price transparency and competition cannot be overstated. A number of peer-reviewed studies of the airline industry have confirmed that, with the emergence of OTAs, price transparency and price competition among airlines has increased.  AA readily admits as much.  In its 2010 Annual Report, AA acknowledged the consumer benefits of "pricing transparency resulting from the use of the internet," citing it as a factor limiting AA's ability to charge higher prices.  More recently, Isabella Goren, AA's Chief Financial Officer and Senior Vice President, confirmed that "[t]he intensity of [airline] competition has increased markedly since the advent of Internet-based marketing and reservations systems that resulted in complete price transparency to the consumer—making comparison shopping for the lowest fare extremely easy."  This intense price competition and absolute transparency has greatly benefited travelers.

40.     Because of these procompetitive benefits of OTAs, today the majority of airline tickets are now purchased over the Internet.  In 2010, fifty-four percent of airline tickets were purchased online.  Approximately 60% of airline ticket sales are booked through a travel agency. OTAs facilitate the vast majority of those sales.  Orbitz, Expedia, Priceline, and Travelocity are among the major OTAs.  On average, fares sold through OTAs are 45% cheaper than those sold through brick-and-mortar travel agencies.

C.      **Despegar and Ticket Sales on Latin American Routes**

41.      Despegar plays a prominent role in the OTA industry.  For ticket sales for flights between U.S. and Latin American cities, or for U.S. travelers flying between two Latin American cities, Despegar is the largest OTA and is largely responsible for the dramatic increase in price transparency for Latin American flights.

42.      Despegar was founded in 1999 in recognition that airline ticket sales for Latin American markets and routes were inefficient and that pricing was opaque.  Roberto Souviron, one of Despegar's co-founders, decided to found the company after waiting on line for two and a half hours at a travel agency in Argentina.  Since its founding, Despegar has grown rapidly. Despegar has invested tremendous amounts of money on developing the sophisticated infrastructure and technology required to deliver its broad-ranging and high-value travel services timely, accurately, and on a massive scale.  A year after its launch, it was servicing eight countries in Latin America.  Now, fifteen years after its launch, Despegar has grown to be the largest OTA in Latin America, with a presence in 21 countries, and approximately 3,000 employees.  It is also the largest Spanish- and Portuguese-language OTA in the world.  Despegar now provides its travelers with access to over 500 airlines, and it has served over 20 million travelers.  As part of its business, Despegar is a consumer of AA travel services and has purchased large quantities of AA tickets.

43.      Latin America is comprised of 23 countries with a total population of approximately 500 million people.  Traditionally, travel booking was largely an offline process. But as the number of Internet savvy travelers in the region has grown exponentially, online distribution of airline tickets has become the leading method for sales.  A $46 billion market, Latin America represented 5 percent of the $1.025 trillion in global travel spending in 2011;

29

according to business forecasts, through 2016 Latin America travel spending will double relative

to the global economy.  A September 2012 report from Barclays Capital predicted Latin America

will lead all world regions in online travel sales growth through 2016, increasing by more than

30% on a yearly basis.  Latin America will surpass the Asia-Pacific region in terms of online

sales as a percentage of total travel sales.  Moreover, consulting firms estimate that there are

more than 278 million internet users across Latin America, eclipsing the number of internet users

in both North America and Europe.  Despegar, as the largest OTA servicing Latin America, is a

leader in facilitating these ticket sales and is poised to capitalize on the sizeable growth of the

market.

       44.    Despegar USA, the Counterclaim Plaintiff here, provides services to U.S.-based

travelers, many of whom book travel to and from Latin America.  On Despegar USA's website,

located at http://www.us.despegar.com, a customer can easily compare flight itineraries sorted by

price and compare prices across airlines to identify the best possible itinerary.  For example:



45.     The price comparison and transparency offered by Despegar USA allows travelers to find the best price possible for their trips when choosing among many options.  But despite the exponential growth of travel spending and online ticket sales in Latin America, in many Latin American markets and on many routes between Latin American cities or between domestic locations or U.S. cities and Latin American cities there remains an absence of meaningful competition among airlines.

46.     For example, in the first quarter of 2013, AA had a 70% to 100% share of non-stop flight options between hundreds of domestic-domestic or domestic-international city pairs serviced by Despegar USA.  Many of these routes are to and from important business centers, including Dallas/Fort Worth, New York, Miami, Rio de Janeiro, and São Paulo.

47.     Despite the fact that AA and other airlines have large market shares in Latin America generally and on important city pairs, the presence of Despegar and the price transparency that it brings to the market constrains the prices that AA and other airlines can charge.  The existence of Despegar USA also facilitates the entrance of new airlines providing travel services on these routes.  New entrants can compete aggressively against major airlines like AA on price through an OTA like Despegar.

**D.     AA is Unable to Compete on the Merits in a Transparent, Competitive Market for Ticket Sales.**

48.     Despegar is not alone in the price-constraining effect it has on major airlines' abilities to charge high prices for airline tickets.  OTAs as an industry have constrained AA and other airlines from charging high prices.

49.     Unfortunately for AA, it was not able to compete on the merits in this transparent, price-conscious environment.  For many consumers, price is the determining factor in electing between travel alternatives.  Because AA has had the highest cost structure of any major U.S.

airline, it was not well-positioned to compete with its peers and newer startups on price and to attract travelers.  For example, AA has had the highest labor costs in the industry, and it employed older and less fuel-efficient planes resulting in fuel costs that tended to be higher than its major competitors.  AA was the only major U.S. airline to report an earnings loss in the first and second quarters of 2011.  It was also the only major U.S. airline that did not turn a profit in 2010.  From a cost standpoint, AA has not been competitive with its peers.  Because of its inefficiency, AA lost money quarter after quarter, while other, more efficient airlines made profits.

50.     In fact, these high operating costs and AA's inability to match lower fares resulted in AA filing for bankruptcy in November 2011.  AA emerged from bankruptcy only recently, on December 9, 2013.

51.     As made clear through its bankruptcy proceeding, AA blames its financial troubles on the price transparency that currently exists in the market for airline ticket sales.  In written testimony in its bankruptcy proceeding, AA's Chief Restructuring Officer, Beverly Goulet, stated that starting around 2001, with the introduction of "new transparency in pricing brought about by the advent of on-line fare displays and powerful Internet search engines that enable passengers an unprecedented ability to obtain comparative fare pricing on any route at the click of a button," AA's "financial fortunes have reversed and deteriorated, as [AA] faced a competitive landscape transformed by the rise of new lower cost competitors and transparency in pricing . . . ."  According to Ms. Goulet, AA "has learned from bitter experience that if it fails to match fares on a route with lower cost competition, it loses traffic and the route becomes less profitable or more unprofitable; and if [AA] does match fares, it may sustain or stimulate its

share of passenger demand on the route, but it does so at lower yields (revenue per passenger mile), with similar negative impact on profitability."

52.    Similarly, AA's principal economist at its bankruptcy proceeding, Daniel Kasper, testified regarding the extent to which OTAs and the price transparency that comes with them have hampered AA's ability to charge high prices for tickets.  He testified: "Among the key factors that have contributed to [AA's] declining fortunes are . . . [i]ncreasingly intense-and transparent- price and service competition across [AA's] markets that has prevented and will continue to prevent the Company from earning revenues sufficient to cover its current costs."  He also testified, "the increased price transparency resulting from Internet-based search and distribution channels" and "the ability of passengers to easily compare fares across all carriers and thus find the lowest available prices has been a long term, secular decline in airfares."  In fact, according to Mr. Kasper: "The rapid spread of Internet-based airfare search engines has greatly reduced (indeed, almost eliminated) the costs of searching for the lowest possible fares and thus greatly increased consumers' ability to find and purchase the lowest available fares."  Mr. Kasper punctuated his remarks on price transparency by citing a remark that had been published in the *New York Times*: "'Once the Internet took hold' the airlines' assumptions about the viability of their existing fare structures and customer bases 'went to hell in a handbasket.'"

53.    AA attributed the emergence of new, low-cost airlines to the existence of OTAs. As Mr. Kasper testified, the existence of OTAs "was a huge boom for low cost carriers because they could avoid . . . hav[ing] to spend a lot [on] advertising. . . .  The combination of the spread of low cost carriers and the ease of finding low fares had a dramatic effect on prices; that is to say, brought down prices pretty dramatically."

54.     In short, because of AA's massive operating costs, it could not compete on the merits in a transparent marketplace for the sale of tickets.  The growth of OTAs such as Despegar USA have exerted substantial downward pressure on airline ticket prices, including AA's prices, and have opened the door for new, low-cost airline entrants that will compete with AA further on price.

**E.     AA's Attempts to Change the Market on the Merits Have Been Unsuccessful.**

55.     Given these competitive realities of the current market for ticket sales, AA has attempted to change the playing field.  According to AA's director of distribution strategies, Cory Garner, AA has committed itself "to a wholesale shake-up of its distribution strategy by requiring all external sellers to access its fares and schedules through a direct electronic link rather than through the . . . GDS . . . that still dominate the airline ticket market . . . ."  AA's stated goal, according to Mr. Garner, is to "[u]ltimately . . . see all travel agency volume going through Direct Connect."

56.     AA attempted to change the playing field by trying to attract travelers directly to AA.com.  Relying on advertising and touting the purported benefits of its frequent flyer program, AAdvantage, AA has encouraged travelers to go directly to its website to make purchases.  For instance, AA has offered a million frequent flier miles sweepstakes to travelers who watch a testimonial video that promotes the AA.com website for booking tickets.  It has also offered incentives for small and medium size businesses that increase the number of tickets sold through AA.com.

57.     But these efforts have largely been unsuccessful.  As price is the primary factor driving purchasers' decisions, travelers largely disfavor shopping through AA's website, which does not allow comparison of prices across airlines.  Even when AA is able to attract travelers

directly to its website, the existence of price transparency in the market—as explained above—has caused AA to drop its fares.  Thus, as long as OTAs are in the market, AA is constrained from charging supracompetitive prices on its own website.

58.    AA thus has aggressively tried to "shake-up" distribution by having all purchases of its tickets on OTAs go through AA Direct Connect.  AA characterizes AA Direct Connect as "a direct link into AA's host reservation system for the facilitation of availability, shopping and pricing, booking, ticketing, and post-ticketing servicing transactions."  In practical terms, that means that when issuing AA tickets, OTAs would send purchases directly through AA's website reservation system, as opposed to through a GDS.  According to AA, Direct Connect will "lower [its] distribution costs and support [its] merchandising program."  Specifically, AA claims that Direct Connect will allow it to sell "a la carte optional services" such as preferred seat or an extra bag.  AA also views Direct Connect as a way to do "dynamic" pricing—meaning, customizing airfares based on the personal information of the traveler.

59.    AA has contacted virtually all of the major OTAs, including Despegar, in an effort to persuade these OTAs to abandon GDSs and adopt AA Direct Connect.  For a number of reasons, OTAs have not reacted favorably.  First, direct connect programs undermine the purposes and missions of OTAs like Despegar USA.  Unlike GDSs, which compare flight information across multiple airlines, AA's Direct Connect is a single-airline technology, showing only AA's own flight information.  Thus, AA Direct Connect cannot be used for price comparison, to book tickets with competing airlines, or to book interline travel—*i.e.*, travel on more than one airline.  Further, airlines like AA are motivated to make a sale at the highest possible price, which conflicts with the OTAs' missions to provide the best available fare or

itinerary.  As already explained, GDSs are generally not compensated based on ticket price, thus their motivations complement those of the OTAs.

60.     Second, from a cost standpoint, AA Direct Connect is not economical for OTAs. The financial incentives and terms AA offers do not compete with what OTAs receive from GDSs.  Moreover, requiring an OTA to use multiple systems—that is, AA Direct Connect for AA bookings and a GDS for all other airlines (or, potentially even more direct connect programs if other airlines follow AA's lead)—decreases efficiencies and adds huge new expenses for OTAs, which they must either bear or pass on to travelers.  Additionally, the use of AA Direct Connect entails added technology costs as the system must be integrated with the travel agencies' other tools.  The technology used by GDSs, on the other hand, integrates seamlessly with travel agency mid- and back-office tools.

61.     The inefficiencies and costs associated with AA Direct Connect are well known in the travel industry.  For instance, the American Society of Travel Agents—the largest association of travel agents in the world—has stated that Direct Connect "threatens to produce expensive and complex 'de-integration' of efficient information flows that have benefited consumers of air travel for decades."  Similarly, the National Business Travel Association (now known as the Global Business Travel Association), which represents over 5,000 corporate members in 30 nations, has warned that "buyers will ultimately foot the bill for marketplace fragmentation caused by airline initiatives that push the travel distribution marketplace in the wrong direction— away from transparency and competitiveness toward confusion and higher costs."  A survey of business travelers conducted by the National Business Travel Association confirmed as much, noting that 89% of travelers expected increased costs associated with AA Direct Connect, and over half were "very concerned" about ticket distribution moving in this direction.  Similarly, a

survey by the Business Travel Coalition, which represents corporate officials responsible for travel procurement in the U.S., found that 98% of managers surveyed did not support AA's Direct Connect strategy.

62.     Not surprisingly, when AA approached the major OTAs—including Orbitz and Expedia—about selling tickets through AA Direct Connect, those OTAs declined.  And for good reason, adopting AA Direct Connect is contrary to their corporate missions, would increase their costs, and is overwhelmingly against their travelers' desires.

63.     In fact, Jim Davidson, the CEO of Farelogix, which is AA's technical partner and the developer of the technology used for Direct Connect, has noted that "travel agencies are not kicking down the door" for Direct Connect and the "hoopla" over AA's program is nonexistent.

64.     In early 2013, AA began discussions with Despegar about adopting AA Direct Connect.  AA made a presentation to Despegar regarding AA Direct Connect and aggressively pushed its adoption.  Despegar ultimately notified AA, however, that it, like many other OTAs, was not interested in moving forward with AA Direct Connect.  As noted below, it was shortly after this that AA pulled its content from Despegar, including Despegar USA, in an effort to force Despegar to accede to AA's demands.

65.     Despite AA's failure to convince travelers to book flights directly through its website or negotiate with OTAs to use AA Direct Connect, it has stated that its "plans are unchanged."  Nonetheless, because nearly the entire travel market is uninterested in AA Direct Connect—according to *Travel Weekly*, it is a "walking corpse"—AA has decided to pursue other means to achieve its "wholesale shake-up" of ticket distribution.

**F.      AA's Anticompetitive Scheme**

66.     Unable to compete in a transparent market on price or change the terms of airline ticket distribution, AA has undertaken an anticompetitive scheme to eliminate OTAs like Despegar USA or force them to adopt AA Direct Connect on highly unfavorable and anticompetitive terms.  As AA's own former CEO, Gerard Arpey, has stated, "the real leverage in what [AA is] attempting to do . . . is to become much more aggressive and in control of [its] ability to merchandize."  Even if AA does not succeed in completely eliminating OTAs, it intends to disrupt and fragment the market for airline tickets in such a way so that it returns to the opaque regime of the 1970s.

67.     AA's principal weapon in executing its anticompetitive scheme has been the complete withdrawal of its business from OTAs and its refusal to deal with those OTAs unless they agree to use AA Direct Connect, in lieu of GDSs, to issue tickets on AA flights.

68.     AA first executed this anticompetitive strategy by threatening Orbitz—the largest OTA—in November 2010 with a complete withdrawal of all AA flights from Orbitz's website unless Orbitz agreed to use AA Direct Connect to issue tickets.  One month later, AA followed through on its threat, withdrawing its fares from Orbitz and terminating Orbitz's right to issue tickets for AA flights.  Orbitz suffered significant injury as a result of AA's refusal to deal, losing nearly half of its market capitalization following the termination of its ticketing authority. AA's attempt to bring Orbitz to its knees was only frustrated when an Illinois court issued an injunction requiring AA to return its content to Orbitz.  The day the injunction issued, Orbitz's stock surged 42%.  Nevertheless, AA had proven what it could do to those OTAs that did not capitulate to its demands.

69.     Soon after AA announced its refusal to deal with Orbitz, OTAs began to succumb to AA's threats, despite previously making clear their desire not to adopt AA Direct Connect.  In January 2011, for example, AA announced that Priceline had agreed to use AA Direct Connect and would begin doing so "in the near future."  Priceline had previously indicated that AA Direct Connect was inefficient and that Priceline would prefer not to use it.

70.     Expedia, the world's largest OTA, also bowed to pressure from AA.  In January 2011, Expedia had announced its opposition to AA's Direct Connect, stating publicly that "American Airlines is attempting to introduce a new direct connect model that will result in higher costs and reduced transparency for consumers, making it difficult to compare American Airlines' ticket prices and options with offerings by other airlines. American Airlines' direct connect model is of questionable, if any, benefit to travelers, would be costly to build and maintain and would compromise travel agents' ability to provide travelers with the best selection."  As a result of Expedia's refusal to sell AA tickets through AA Direct Connect, it stopped selling AA tickets after its public criticism of the program.  Nonetheless, despite Expedia's strongly-worded opposition, a mere three months later, in April 2011, the two companies announced that they were resuming their business relationship and that Expedia "plans to access American's fares, schedules, and customized travel products and services via American's direct connect link by using aggregation technology provided by a GDS."

71.     Similarly, after Despegar notified AA in April 2013 that it would not process AA flights through AA Direct Connect, AA removed all of its flights from Despegar, and its subsidiaries, including Despegar USA, in July 2013 and stated publicly that "fares will not go back on sale on Despegar.com websites until [AA has] satisfactory resolution of the current issues."  For AA, "satisfactory resolution" has always been—without compromise—the

processing of its flights through AA Direct Connect so that AA did not face meaningful price transparency or competition in markets or on routes in which it is supposed to compete.

72.     Then, in January 2014, following its merger with AA, US Airways also withdrew all of its content from Despegar, apparently for the same unlawful purpose—to starve Despegar of content and to inflict a severe economic blow on its business.

73.     Notably, AA has refused to provide content to Despegar that it is otherwise willing to provide to other travel agencies.  As Scott Kirby, President of AA, recently commented, when it comes to dealing with "other agencies, particularly brick-and-mortar . . . that's a really different story than the OTAs."  Despegar offered to charge AA a commission 10% lower than the average commission charged by travel agencies in Latin American markets. But, because AA's refusal to deal with Despegar is part of an anticompetitive scheme, and is not driven by legitimate business reasons, AA refused Despegar's offer.  In fact, at the same time AA was refusing to deal with Despegar on a lower commission basis, it was *increasing* the amount of commission it was paying to offline travel agencies.

74.     Moreover, AA has also restricted Despegar's ability to work with third-party sources of AA inventory—namely air ticketing wholesalers.  These players in the supply chain are prohibited by AA from offering Despegar inventory, and if they do, AA has indicated that they will refuse to do further business with them.

75.     AA has also prohibited certain airlines that are members of the One World Alliance (of which AA is also a member) from issuing codeshare tickets through Despegar. Generally, members of the One World Alliance, pursuant to codeshare agreements, are allowed to sell seats on other airlines with their own flight number.  But AA has prohibited other airlines

from selling seats on AA flights through Despegar, further extending AA's anticompetitive scheme.

76.     AA's anticompetitive scheme has not been limited to major OTAs in the United States.  It has also targeted international OTAs.  For example, after unsuccessfully attempting to cajole Rumbo, Atrapalo, and E-dreams into compliance with its demands regarding Direct Connect, AA pulled its content from those Spanish OTAs.

77.     Similarly, consistent with AA's scheme to eliminate price transparency and competition by restricting price comparison through OTAs, AA has tried to starve OTAs by refusing to deal with meta-search engines like Kayak and Google that deal with OTAs.  These meta-search engines enable consumers to search for flights across multiple airlines, but do not offer booking services—rather, once a customer has located his or her preferred itinerary, the meta-search engine will provide a link to the specific airline's website or to an OTA, where the customer can complete the purchase.  Kayak's founder and CEO, Steve Hafner has stated that "[AA] asked us to suppress search results from competing websites as a condition to displaying their fares" and Google's Vice President for Travel, Jeremy Wertheimer, has stated that "our airline partners were very clear . . . they were not interested in participating if we provided links to OTAs."

78.     Consistent with its scheme to reduce price transparency and stymie the current distribution system, AA has also attempted to force the adoption of AA Direct Connect by unbundling airfare and then withholding certain unbundled ancillary fare content from GDSs so that OTAs may only access that unbundled content through AA Direct Connect.  Ancillary products and services that were previously bundled in airfare include checked baggage, seating

options, and priority boarding.  Notably, AA's efforts to deny "full content" to GDSs and by extension OTAs was a radical departure from historical distribution practices.

79.     By unbundling this content, OTAs are denied full fare information, thus obscuring the true cost of its tickets and hindering the ability of OTAs and travelers to compare fares across airlines.  Travelers are unable to access the information necessary to determine the true cost of travel unless they go directly to the carrier's website.  Further, in order to compare fares, travelers would at a minimum be forced to search various airline websites, which imposes significant inefficiencies.  Even then, it is not clear that travelers can find the information they are looking for prior to purchasing a ticket.

80.     An independent government study found that, "as a result" of the withholding of information, "customers using online travel agencies and traditional or corporate travel agents, which together sell 60 percent of all airline tickets, cannot readily obtain and compare information on complete trip prices that include both the fare and selected service fees." Travelers are harmed by this conduct since they are unable to determine the best available fare; they may purchase the ticket without full knowledge and become captive to the airlines for ancillary services—which, like checking a bag, may actually be essential.  Moreover, AA's refusal to provide complete information impedes OTAs from achieving their core function: to find the best available fare for their travelers.  In fact, as evidenced by Orbitz's loss of market capitalization following AA's termination of its ticketing authority, AA's refusal to provide complete information threatens the very viability of OTAs.

81.     Through this scheme, as many industry participants have observed, AA seeks a return to the days of fragmented, airline-controlled distribution in which airline content was hidden and manipulated to make it more difficult for travelers to compare services and fares.

82.     Each of these anticompetitive acts is taken in furtherance of AA's ultimate objectives of (a) "fragmenting" the distribution of AA content, by which AA means picking and choosing which fares are available to which OTAs and travelers and hiding the best available fares from certain OTAs and travelers; (b) making it harder for travelers to compare AA's offerings with those of other airlines; and (c) leveraging the increased fragmentation and lack of information to extract more revenue from the traveling public.

83.     AA's scheme, which has directly harmed and threatens to harm Despegar USA, other OTAs, and travelers, is anticompetitive in its purpose and effect.  AA's conduct is intended to reduce and eliminate competition from OTAs like Despegar USA in the provision of booking services to travelers.  AA's conduct also harms travelers.  Rather than competing to win travelers' business on the merits by lowering fares or improving its services, AA aims to eliminate price transparency, to prevent efficient comparison shopping, and to make it difficult if not impossible for travelers to determine the airline that offers the best combination of price and service to suit their needs.  As price transparency declines, so too will AA's incentives to offer competitive fares, leading to higher airline ticket prices.

84.     All of this will allow AA to continue to maintain its monopoly over certain geographic markets and over routes between certain cities—including many domestic and Latin American markets and routes that Despegar USA services—and will facilitate AA's ability to charge supracompetitive prices in these markets where it faces little or no competition.  Moreover, AA's conduct will allow it to acquire monopoly power in markets in which it is currently a potential monopolist by fragmenting the market for sale of tickets, which will in turn harm startup airlines with less brand recognition (and which as a result would be less likely to attract consumers to their websites).

85.     This anticompetitive scheme has not been without short-term losses to AA. Economic evidence indicates that AA lost over $50 million in revenue in the first quarter of 2011 alone after its refusal to deal with Orbitz, which represents 1.6% of AA's total quarterly revenue. AA also carried almost 2% fewer passengers in the first quarter of 2011 compared to the prior four quarters.  During the same period, AA's major competitors increased their passenger count. Thus AA took substantial economic losses from its refusal to deal with Orbitz, and it is believed that AA is again taking sizeable losses from its refusal to deal with Despegar USA.  Nonetheless, AA has proven itself willing to accept short-term losses arising from the pulling of its content from OTAs in order to fragment the market for the sale of tickets and then recoup massive, supracompetitive profits on the sale of tickets in opaque markets in which AA exercises monopoly power.

86.     AA's refusal to deal with Despegar USA and other OTAs was not a result of a legitimate business or procompetitive justification.  While AA generally declines to provide the specific reasons for its refusal to deal with certain OTAs, when it does, it only expresses concerns generally about "unfair" practices—without providing any details.  These purported unfair practices, however, are mere pretext for AA's refusal to deal with OTAs, as evidenced by the fact that AA has refused to do business with OTAs shortly after those OTAs refuse to adopt AA Direct Connect.  Notably, other airlines have not encountered the same type of purportedly "unfair" practices by OTAs that AA claims to have encountered—which further demonstrates that AA's claims that it is being subjected to unfair practices by OTAs are merely pretextual.

## G.     AA's Defamatory Statements Directed at Despegar

87.     As part of its scheme, AA has also made defamatory statements directed at Despegar that are designed to injury Despegar in its business.

88.     After Despegar refused to accede to AA's demands regarding AA Direct Connect,

but no later than July 31, 2013, AA issued a press release titled "American Airlines Fares

Removed From Despegar.com."  The press release states: "American Airlines has removed its

flights for sale on the online booking site, Despegar.com. The airline made the decision to pull

its content from the site after discovering Despegar.com was using unfair and unclear pricing

practices."  The press release, which states that it is "for release" on July 31, 2013, can be

downloaded from AA's website at http://hub.aa.com/en/nr/pressrelease/american-fares-removed-

from-despegar. This webpage was published to third parties via AA's website.  This press release

was intended for republication, and was republished, by third-party publishers.

89.     In addition, no later than August 1, 2013, AA published on its website, at

http://www.aa.com/i18n/urls/despegar.jsp, a webpage titled "American Airlines Fares No Longer

Offered On Despegar.com."  This webpage states:

>American Airlines has removed its flights for sale from Despegar.com and
>websites powered by Despegar.com, including all worldwide sites such as
>Decolar.com. . . .
>
>American made the decision to pull its content after discovering Despegar.com
>was using unfair and unclear pricing practices. We firmly believe customers
>should be presented with complete and accurate pricing information so they can
>make an informed decision when booking flights.

90.     This webpage also purports to provide answers to "Frequently Asked Questions,"

including the following question and answer:

>Q: What unfair and unclear practices by Despegar.com did American uncover?
>A: This matter is currently under legal review and American cannot comment on
>specifics at this time.

91.     This webpage was published to third parties via AA's website.  This publication

was intended for republication, and was republished, by third-party publishers.

45

92.     AA's accusations are, both literally and by implication, false and defamatory.  No Despegar entity, including Despegar USA, used or uses "unfair and unclear pricing practices." In addition, each Despegar entity, including Despegar USA, presents its travelers with "complete and accurate pricing information."  AA's false statements are all the more defamatory because AA made these spurious factual allegations without providing their bases, stating that the issue is "under legal review and American cannot comment on specifics at this time."  Thus, AA's statements invite readers to speculate as to the nature of these purported "unfair and unclear practices," including falsely suggesting that Despegar is breaking the law.

93.     These false statements were published to United States residents, including residents of Florida, and caused damages, including actual damages, to Despegar USA, in the form of lost website traffic and ticket sales, including from Florida residents.  AA's claims regarding Despegar.com's pricing practices injured the business of Despegar and the business of all its subsidiaries, including Despegar USA.

**H.     AA Has Harmed Competition, OTAs such as Despegar USA, and Consumers.**

94.     AA's anticompetitive acts, including its refusal to deal with OTAs that are unwilling to accept its AA Direct Connect program, its refusal to deal with meta-search engines that deal with these OTAs, and its unbundling and restricting of airline content, among other practices, have had serious anticompetitive effects on Despegar USA and other OTAs as well as on competition in the AA Dominant City Pair and AA Near-Dominant City Pair markets (defined below), including on United States consumers buying airline tickets in those markets.

95.     Through these anticompetitive acts, AA is costing Despegar USA and other OTAs considerable amounts of money and risking putting them out of business.  Even if AA does not succeed in putting these OTAs out of business, its anticompetitive scheme will force these OTAs

46

into unfavorable terms, with considerable costs to OTAs in the form of greater operating costs and lost profits.

96.     These anticompetitive acts will also cause substantial injury to consumers in the form of higher prices on airline tickets.  By eliminating or fragmenting the OTA business, AA will remove the primary driver of price transparency and competition.  In markets in which AA has monopoly power or has the potential to acquire monopoly power, this opacity will allow it to charge supracompetitive prices.  This monopoly power will also facilitate its exclusion of new entrants, because without the OTA platforms for the dissemination of tickets, new competing airlines will not be able to generate enough ticket sales to compete.  AA intends to return the market for ticket sales to the structure of the 1970s, without meaningful price competition or transparency—an outcome particularly costly to consumers.

## INTERSTATE TRADE AND COMMERCE

97.     The activities of AA as alleged herein were within the flow of, and substantially affected, interstate commerce. At the end of 2010, AA and affiliated airlines provided scheduled jet service to approximately 250 destinations, including interstate flights within the United States and flights between the United States and international destinations.

## RELEVANT MARKETS

98.     There are at least two relevant markets in which to evaluate AA's anticompetitive conduct: (1) the market for non-stop passenger air travel between AA dominant city pairs; and (2) the market for non-stop passenger air travel between AA near-dominant city pairs.  In these markets, AA currently has or has the strong probability of acquiring monopoly power.

**A.      Market for Non-Stop Passenger Air Travel Between AA Dominant City Pairs**

99.     The provision of non-stop passenger air travel between each city pair in AA Dominant City Pairs are relevant markets.  Empirical studies of the airline industry support a city-pair approach to market definition.

100.    There are no reasonable substitutes for air travel between two cities (for example, travel from Buenos Aires to Miami is not a substitute for travel from Buenos Aires to Dallas).

101.    Further, direct service represents a different market than one-stop service because travelers are generally willing to pay significantly more for direct service than connecting service. For example, a non-stop ticket between LaGuardia Airport in New York City and Dallas/Fort Worth International Airport on average costs roughly 2.4 times more than a ticket for connecting service.  The lower fares on one-stop routes illustrates the increased competition in that market due to the fact that travelers have significantly more options for how to get from point A to point B than they do in a non-stop market.

102.    AA is one of the largest airlines in the United States.  Together with affiliated airlines doing business as U.S. Airways, American Eagle, and AmericanConnection, AA serves more than 250 cities with, on average, 3,400 daily flights.

103.    AA has monopoly power over non-stop passenger air travel between each AA Dominant City Pair.  An AA Dominant City Pair is defined as an air travel route for which AA has a 70% to 100% share of non-stop flight options between domestic-only or domestic-international city pairs serviced by Despegar USA.

104.    AA's route network has hubs in important business centers, including Dallas/Fort Worth, New York, Miami, Rio de Janeiro and São Paulo.  AA dominates non-stop flights between several of these hubs and other major cities that are key business centers.  For example,

AA controls a dominant market share of the non-stop flights between the following city pairs, among others:

    a.   Brasilia, Brazil to Miami;

    b.   Manaus, Brazil to Miami;

    c.   Recife, Brazil to Miami;

    d.   Rio de Janeiro, Brazil to Dallas Fort Worth;

    e.   São Paulo, Brazil to Dallas Fort Worth;

    f.   Salvador de Bahia, Brazil to Miami;

    g.   San Jose, Costa Rica to Dallas Fort Worth;

    h.   San Jose, Costa Rica to Miami;

    i.   Guanajuato, Mexico to Dallas Fort Worth;

    j.   Cancun, Mexico to Miami;

    k.   Guadalajara, Mexico to Dallas Fort Worth;

    l.   Monterrey, Mexico to Dallas Fort Worth;

    m.   Maracaibo, Venezuela to Miami; and

    n.   Caracas, Venezuela to New York City.

105.     At certain of its hubs, AA dominates not only particular routes but also passenger air travel generally.  For example, in 2010 AA accounted for roughly 86% of all seats originating from Dallas/Fort Worth.  AA also accounted for roughly 74% of all seats, and roughly 55% of all passengers, originating from Dallas/Fort Worth and Love Field combined.  In addition, AA accounted for roughly 70% of all seats, and roughly 51% of all passengers, originating from Miami International Airport.

106.    AA also controls flights from the United States to various Latin American markets.  AA provides the only flight options for travel between many U.S. cities and destinations within Latin America.  In 2013 AA accounted for the majority of non-stop flights on hundreds of different routes between cities in the United States and Latin America.

107.    AA's market power is further strengthened by its frequent flyer program. Travelers in areas dominated by a carrier—such as AA in Dallas/Fort Worth or Miami—tend to accumulate "points" or "miles" in that carrier's frequent flyer program.  Frequent flyer programs encourage customer loyalty (i.e., the use of a particular carrier even when a competing carrier has a lower fare or otherwise has a more competitive alternative) by offering free tickets and highly coveted benefits—such as complimentary seat upgrades, priority check-in service, and priority boarding, among others—for meeting certain flight mile benchmarks.  Frequent flyer programs encourage travelers to fly with an airline, even when another airline offers a lower fare or more suitable service, by offering free tickets and other benefits such as seat upgrades and priority check-in and boarding.  Thus frequent flyer programs lock in consumers and create high switching costs, further cementing AA's monopoly.  AA's AAdvantage frequent flyer program is the largest in the world and, even more than other such programs, creates a barrier to competitive entry which enhances AA's market power.

108.    There are significant barriers to entry for each AA Dominant City Pair, including the need for equipment, an FAA license, gates at the relevant airports, consumer reputation, and a viable frequent flyer program.  An airline with a monopoly in any of these city pairs therefore could charge a monopoly price for travel between the two cities in the pair.

**B.      Market for Non-Stop Passenger Air Travel Between AA Near-Dominant City Pairs**

109.      The provision of non-stop passenger air travel between each city pair in AA Near-Dominant City Pairs are relevant markets.

110.      AA has substantial market power, approaching monopoly power, over non-stop passenger air travel between each AA Near-Dominant City Pair.  A Near-Dominant City Pair is defined as an air travel route for which AA has a 40% to 70% share of non-stop flight options between domestic-only or domestic-international city pairs serviced by Despegar USA.  AA thus enjoys significant market power, approaching monopoly power, on these routes.

111.      There are significant barriers to entry for each AA Near-Dominant City Pair, including the need for equipment, an FAA license, gates at the relevant airports, consumer reputation, and a viable frequent flyer program.  An airline with a monopoly in any of these city pairs therefore could charge a monopoly price for travel between the two cities in the pair.

<u>CLAIMS FOR RELIEF</u>

<u>COUNT I</u>
**MONOPOLIZATION OF NON-STOP PASSENGER AIR TRAVEL
BETWEEN THE AA DOMINANT CITY PAIRS IN VIOLATION OF 15 U.S.C. § 2**

112.      Despegar USA alleges and incorporates all prior paragraphs as though set forth fully herein.

113.      AA possesses monopoly power over non-stop passenger air travel between the AA Dominant City Pairs.  AA has willfully acted to acquire, enhance, and maintain that power through the anticompetitive, deceptive and exclusionary acts and practices described herein, including:  (a) withholding content from and refusing to deal with OTAs such as Despegar USA, in a departure from its long-standing practices, without legitimate business justification, and with the sacrifice of great profits; (b) refusing to deal with meta-search engines that deal with OTAs such as Despegar USA; (c) unbundling content that was previously provided to GDSs and OTAs

51

and refusing to provide that content, in a departure from its long-standing practices, without legitimate business justification, and at great expense; (d) forcing OTAs to use AA's inferior Direct Connect as a condition for doing business; and (e) fragmenting the availability of full fare information in order to minimize price transparency.  AA will continue to engage in anticompetitive, deceptive, and exclusionary conduct unless restrained by this Court.

114.    The direct effect of AA's exclusionary conduct is the destruction of Despegar USA and other OTAs that facilitate transparent and efficient fare comparisons.  Through the destruction of Despegar USA and other OTAs, AA's exclusionary conduct indirectly decreases the ability of United States-based travelers to identify and book the best available fares for their desired itineraries; reduces price competition among airlines; raises barriers to entry in the AA Dominant City Pairs; preserves AA's ability to charge supracompetitive prices in the AA Dominant City Pairs; and enhances AA's ability to increase prices in AA Dominant City Pairs.

115.    AA has acted with intent to illegally acquire, enhance, and maintain its monopoly over non-stop passenger air travel between the AA Dominant City Pairs.

116.    AA's conduct violates Section 2 of the Sherman Act, 15 U.S.C. § 2.

117.    There is no lawful justification for AA's conduct.

118.    AA's illegal conduct has directly and proximately caused injury to interstate commerce and to Despegar USA's business and property, and also presents an imminent threat of causing further significant injury.

## **COUNT II**
### **ATTEMPTED MONOPOLIZATION OF NON-STOP PASSENGER AIR TRAVEL BETWEEN THE AA NEAR-DOMINANT CITY PAIRS IN VIOLATION OF 15 U.S.C. § 2**

119.    Despegar USA alleges and incorporates all prior paragraphs as though set forth fully herein.

120.     AA has between a 40% and 70% share of seat capacity in each of the AA Near Dominant City Pairs.

121.     AA has willfully engaged in the anticompetitive, deceptive and exclusionary acts and practices described herein, including: (a) withholding content from and refusing to deal with OTAs such as Despegar USA, in a departure from its long-standing practices, without legitimate business justification, and with the sacrifice of great profits; (b) refusing to deal with meta-search engines that deal with OTAs such as Despegar USA; (c) unbundling content that was previously provided to GDSs and OTAs and refusing to provide that content, in a departure from its long-standing practices, without legitimate business justification, and at great expense; (d) forcing OTAs to use AA's inferior Direct Connect as a condition for doing business; and (e) fragmenting the availability of full fare information in order to minimize price transparency.  AA engaged in the above conduct with the specific intent to destroy competition and the specific intent that AA acquire, enhance, and maintain monopoly power over non-stop passenger air travel between the AA Near Dominant City Pairs.

122.     The direct effect of AA's exclusionary conduct is the destruction of Despegar USA and other OTAs that facilitate transparent and efficient fare comparisons.  Through the destruction of Despegar USA and other OTAs, AA's exclusionary conduct indirectly decreases the ability of United States-based travelers to identify and book the best available fares for their desired itineraries; reduces price competition among airlines; deceives travelers into unwittingly paying higher prices for AA tickets and otherwise increases AA's ability to raise price in the AA Near Dominant City Pairs; and enables AA to attain monopoly power in the AA Near Dominant City Pairs other than through competition on the merits.

123.    Unless restrained by this Court, there is thus a dangerous probability that AA will succeed in obtaining monopoly power over non-stop passenger air travel between the AA Near Dominant City Pairs.

124.    AA's conduct violates Section 2 of the Sherman Act, 15 U.S.C. § 2.

125.    There is no lawful justification for AA's conduct.

126.    AA's illegal conduct has directly and proximately caused injury to interstate commerce and to Despegar USA's business and property, and also presents an imminent threat of causing further significant injury.

## COUNT III
### DEFAMATION

127.    Despegar USA alleges and incorporates all prior paragraphs as though set forth fully herein.

128.    On or before July 31, 2013, AA published a false and defamatory statement, as described above, on its website at http://hub.aa.com/en/nr/pressrelease/american-fares-removed-from-despegar.

129.    In addition, on or before August 1, 2013, AA published false and defamatory statements, as described above, on its website located at

http://www.aa.com/i18n/urls/despegar.jsp.

130.    The statements on both websites were not only literally false but also, when read in their entire context, false by implication.  These statements suggest that Despegar, including Despegar USA, uses "unfair and unclear pricing practices," and, by suggesting that these practices are "under legal review," falsely suggests that Despegar, including Despegar USA, is breaking the law.

131.    The statements are about Despegar and its subsidiaries, including Despegar USA.

132.    The false statements were published by AA to third parties, including United States and Florida residents, through its posting on the Internet.

133.    AA acted at least negligently in publishing these false statements.

134.    AA continues to publish these false statements by continuing to make them available on its website.

135.    Despegar USA has suffered damages, including actual damages, as a result of AA's false statements.  In addition, Despegar USA has suffered irreparable harm, including reputational injury, for which Despegar USA has is no adequate remedy at law.

136.    In addition, AA's false statements about Despegar USA's purported dishonesty in business injured Despegar USA in its business and business relationships and are thus defamation *per se*.

137.    In addition, AA's false statements imputed upon Despegar USA conduct, characteristics, or a condition incompatible with the proper exercise of a lawful business, and are thus defamation *per se*.

138.    Despegar USA is a private figure for the purposes of a defamation claim. However, even if Despegar USA were considered to be a public figure, AA either knew its defamatory statements were false or published them with reckless disregard, despite knowing their probable falsity.

139.    There is no lawful justification for AA's conduct.

## **PRAYER FOR RELIEF**

Accordingly, Despegar USA prays for entry of judgment in their favor as follows:

   a.   A decree that AA has violated, and threatens to continue violating, the Sherman Act;

   b.   A permanent injunction prohibiting AA and its agents, servants, employees, affiliates, divisions, and subsidiaries, and those in association with them from engaging in conduct that violates the antitrust laws;

   c.   An award of three times its actual damages for the antitrust violation;

   d.   An award of damages for AA's publication of defamatory statements, including an award of punitive damages to punish and penalize AA and deter AA from repeating its unlawful conduct;

   e.   A permanent injunction enjoining AA from continuing to publish its defamatory statements;

   f.   An injunction requiring AA to publish a retraction and correction of its defamatory statements, placed with equal prominence on its website as the defamatory statements and published as a press release to the same third parties to which the original press releases were issued;

   g.   An award of all costs and fees in this action, including attorneys' fees and pre- and post-judgment interest; and

   h.   Such other relief as this Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Defendants demand a trial by jury on all issues so triable in this action.


Dated:  June 16, 2014

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By:  _/s/ Marc L. Greenwald_
Marc L. Greenwald (admitted *pro hac vice*)
marcgreenwald@quinnemanuel.com
Todd Anten (admitted *pro hac vice*)
toddanten@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, New York 10011
Tel: (212) 849-7000
Fax: (212) 849-7100

CAREY RODRIGUEZ GREENBERG O'KEEFE, LLP
Patrick E. Gonya, Jr.
Florida Bar No. 0100020
pgonya@careyrodriguez.com
1395 Brickell Avenue, Suite 700
Miami, Florida 33131
Tel: (305) 356-5478
Fax: (305) 356-3428

*Counsel for Defendants and Counterclaim Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on June 16, 2014, I electronically filed the foregoing document with the clerk of Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the below Service List, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

*/s/ Patrick E. Gonya, Jr.*

\*       \*       \*       \*

## <u>SERVICE LIST</u>

Humberto H. Ocariz, Esq.
hocariz@shb.com
Michael A. Holt, Esq.
mholt@shb.com
Shook Hardy & Bacon, LLP
201 Biscayne Boulevard, Suite 3200
Miami, Florida 33131
Tel: (305) 358-5171
Fax: (305) 358-7470

**Counsel for Plaintiff American Airlines, Inc.**