```
 1                   UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2                         MIAMI DIVISION
                     CASE NO. 13-22773-CV-DPG
 3

 4   AMERICAN AIRLINES, INC.,              Miami, Florida
     a Delaware Corporation,
 5
          Plaintiff,                       December 17, 2014
 6
              vs.                          1:31 p.m. to 2:50 p.m.
 7
     DESPEGAR.COM USA, INC.
 8
          Defendant.                       Pages 1 to 55
 9   _____

10

11                         MOTION HEARING
                 BEFORE THE HONORABLE DARRIN P. GAYLES
12                  UNITED STATES DISTRICT JUDGE

13

14   APPEARANCES:

15

16   FOR THE PLAINTIFF:        HUMBERTO OCARIZ, ESQ.
                               SHOOK, HARDY & BACON
17                             201 S. Biscayne Boulevard
                               Suite 3200
18                             Miami, Florida 33131
                                    -and-
19                             CHARLES DIAMOND, ESQ.
                               ANDREW J. FRACKMAN, ESQ.
20                             O'MELVENY & MYERS, LLP
                               7 Times Squire
21                             New York, New York 10036

22   FOR THE DEFENDANT:        MARC L. GREENWALD, ESQ.
                               STEIG D. OLSON, ESQ.
23                             QUINN EMANUEL URQUHART & SULLIVAN
                               51 Madison Avenue
24                             22nd Floor
                               Miami, Florida 33131
25                                  -and-
```

```
 1                              PATRICK EDWARD GONYA, JR.
                                CAREY RODRIGUEZ GREENBERG O'KEEFE
 2                              1395 Brickell Avenue
                                Suite 700
 3                              Miami, Florida 33131

 4

 5   REPORTED BY:               PATRICIA DIAZ, RPR, FPR
                                Official Court Reporter
 6                              United States District Court
                                400 North Miami Avenue
 7                              Eleventh Floor
                                Miami, Florida 33128
 8                              (305) 523-5178

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

 1            (Call to the order of the Court)

 2        THE COURT:  All right.  Please be seated.

 3        COURTROOM DEPUTY:  Calling American Airlines,

 4  Incorporated, versus Despegar.com USA, Incorporated, et al.,

 5  Case Number 13-CV-22773.

 6        Counsel, please state your appearance for the record.

 7        MR. OCARIZ:  Good morning, Your Honor.  Bert Ocariz

 8  from Shook Hardy & Bacon on behalf of American Airlines.

 9        MR. FRACKMAN:  Andrew Frackman of O'Melveny & Myers

10  also for American Airlines.

11        MR. DIAMOND:  Charles Diamond of O'Melveny & Myers,

12  also on behalf of American.

13        THE COURT:  Good afternoon.

14        MR. GREENWALD:  Good afternoon, Judge.  Mark Greenwald,

15  Quinn Emanuel Urquhart & Sullivan on behalf of defendant

16  Despegar and also the general counsel of Despegar, Guillermo

17  Perrone is in the first row.

18        THE COURT:  Okay.  Thank you very much.

19        MR. OLSON:  Good afternoon, Your Honor.  Steig Olson

20  with Quinn Emanuel on behalf of Despegar.

21        MR. GONYA:  And Your Honor, Patrick Gonya with Carey

22  Rodriguez on behalf of the defendant.

23        THE COURT:  Good afternoon.  We have a couple of

24  competing motions.  Why don't we start first, I guess, with

25  American?

```
 1            MR. OCARIZ:  Do you want to hear American's motion to

 2   dismiss the antitrust counterclaim?

 3            THE COURT:  Or do you think it's better that I hear

 4   from the defense first?

 5            MR. OLSON:  That's fine with us to hear that one first,

 6   Your Honor.

 7            THE COURT:  Okay.

 8            MR. OCARIZ:  Well, we think it makes sense to

 9   perhaps --

10            THE COURT:  Inverse, okay.

11            MR. OCARIZ:  -- flip the order and address the one

12   directed to the operative complaint and then the counterclaim,

13   if that's fine with the Court.

14            THE COURT:  That's fine.

15            MR. GREENWALD:  Your Honor, do you want me to be at the

16   podium or here?

17            THE COURT:  You can stay there, it's fine.

18            MR. GREENWALD:  Thank you.

19            THE COURT:  Unless you prefer to use the podium.

20            MR. GREENWALD:  No, no, I'm perfectly comfortable here.

21            So, Your Honor, this motion is addressed to the amended

22   complaint filed by American and does not require the Court to

23   revisit any decisions made by Judge Altonaga on the prior

24   motion.

25            The first area we'd like to address is ADA preemption.
```

```
 1   The ADA statute is very clear and it says that of all related

 2   to price, route or service of an airline is preempted and these

 3   are the Claims 3 through 7 are state laws directed, in this

 4   case, at the price.  That's what this dispute is about, the

 5   price that is offered by American.

 6           There is no question that that's what their claims are

 7   about, and the Supreme Court in the Morales case made very

 8   clear that Congress intended a broad preemptive act in passing

 9   the ADA.

10           So the state law claims -- not the federal claims, but

11   the state law claims, unfair competition, the Florida act

12   FDUPTA and the conspiracy claims are preempted.

13           American's argument, they set up straw men.  First,

14   they say that we claim that all claims against travel agents

15   are preempted.  That's not what we are claiming.  We are

16   claiming that these particular claims brought by American

17   because they relate to price offered by American, and that's

18   clearly what their complaint is about, are preempted.

19           Their second claim is that Congress intended only to

20   preempt claims brought against airlines, but that's not what

21   the statute says.  The statute says related to, and that's what

22   the Supreme Court says.

23           So for those reasons, the Court should dismiss all of

24   the state law claims.

25           THE COURT:  Okay.  Do you want to take up that issue
```

1    first?

2         MR. OCARIZ:  Yes, thank you, Your Honor.  If I may, I

3    am going to step back for a minute because I think in order to

4    get where we need to go, we need to understand a little bit of

5    how we got here.  How we got here in connection with ADA

6    preemption is really what was the purpose of Congress behind

7    this preemption provision?  And at the bottom of it was,

8    Congress decided that it was better to let the free market

9    determine what was going to govern in terms of prices, routes

10   and services on which airlines compete.

11        So they decided after regulating the airline industry

12   since 1958, they decided in 1978 to deregulate the industry.

13   The preemption clause was put in so that states wouldn't try to

14   re-regulate what Congress decided should be deregulated.  So

15   that was the setting for the ADA preemption.

16        Where has ADA preemption law developed as we sit here

17   today?  The ADA preemption law is looking at anything that not

18   just touches upon, as Mr. Greenwald suggests, touches upon

19   price, routes or services, but really what goes to the core

20   behind those services.

21        I think a good case for the Court to examine which lays

22   out a nice framework for the analysis is the Branche case that

23   was cited in the submissions from the parties.  It's an

24   Eleventh Circuit Court case from 2003.

25        And essentially, what the Court says there is when you

```
 1     are looking at ADA preemption, you have to see whether this
 2     goes to those typical types of services on which airlines
 3     compete and hence the phrase, prices, routes or services.
 4              So this case, contrary to what Mr. Greenwald suggested,
 5     and I wrote down exactly what he said, that this dispute is
 6     about the price offered by American.  That entirely misses the
 7     mark.  This case has nothing to do with the price offered by
 8     American.  This case has to do with American's protection of
 9     its trademark claims, and you see that laid out throughout the
10     complaint.
11              Counts 1 and 2 go directly to the protection of our
12     marks.  Why is that?
13              It's how they behaved in connection with our marks.
14     What were they doing?  As we set forth in our complaint and
15     submission to the Court, they were using American Airlines'
16     brand, their trademark, to lure these customers to their
17     website and then they were doing one of three things; they were
18     either hiding a fee in connection with American's published
19     price, so if American had a flight that American's fare was
20     $400, they would post it on their website at $425 or some
21     number.
22              The other thing that they were doing is bringing
23     customers to their website because they offered availability on
24     American.  Then they would have these bookings, presumably
25     going through them on American flights that they were actually
```

```
 1   transferring to some other travel agent.  And then the other
 2   thing that they were doing was discriminating against
 3   American's flights by having a higher service fee than they
 4   charged to other airlines.  All triggered from the fact that it
 5   was American's marks that were bringing customers to their
 6   website.
 7        That's why you see if you go through the complaint, not
 8   only in the way that the claims themselves are asserted, but
 9   even the factual predicate for the claims, specifically at
10   paragraphs, I believe, it's 67 through 75 of the amended
11   complaint, we have an entire section -- after describing the
12   conduct, we have an entire section that goes to how American's
13   marks are harmed and how this conduct is harming American.  It
14   is all linked to the protection of the marks.
15        So where does that get us now on the state law claims?
16        If you look at the state law claims, all of those
17   claims incorporate the same allegations.  They incorporate the
18   same paragraphs that are relied on for the trademark claim, and
19   rely on that specific misconduct and misuse of the marks to
20   support the claim.
21        When you go through Branche and some of the other cases
22   we cited to the Court, like the Alaska Airlines case and the
23   7th circuit case and travel all around the world, what you see
24   there is the Court said it's not the labels, it's not the
25   labels of the claim that matter, you have to look at what the
```

 1   underlying claim is really trying to do.

 2        And when something touches upon -- I shouldn't say the

 3   word touches upon.  When something relates to, that's the

 4   important link, because as they said in Branche, you might have

 5   some connection to price, routes or services but the inquiry

 6   doesn't end there.  You have to go a little further and see if

 7   this is an area which the ADA sought to preempt because it was

 8   a traditional route, service or price that was what Congress

 9   wanted the market to dictate the price.

10        That's why our case is different.  We are not seeking

11   to enforce some price issue or some deceptive practice related

12   to our price, American Airlines' price.  What we are seeking to

13   prevent in this case is their continued misuse of the

14   trademark, and for that reason we don't think that ADA

15   preemption applies as to those state law claims.

16        THE COURT:  Let me tell you, where I am having some

17   difficulty is, I mean, it seems to have been applied pretty

18   broadly in the cases that I reviewed.  You know, kind of how

19   they carved out the exceptions is -- like, for example, I think

20   a breach of contract claim wouldn't fall under the ADA because

21   it's something unique between the parties.  It's something they

22   contracted.  There is no broader kind of application to

23   whatever the controversy is.  That's not really what I have

24   here or what you are claiming in these state claims.

25        MR. OCARIZ:  That's correct, Your Honor.  You are

```
 1    absolutely right, and I think that's where Branche is
 2    instructive because it's not the label.  Yes, historically,
 3    breach of contract claims have not been preempted because the
 4    Supreme Court has found those really reflect private dealings
 5    between the parties and that's not what ADA seeks to preempt.
 6            The difference is, however, if you look at some of the
 7    cases, there have been breach of contract claims preempted
 8    because they try to impose obligation, such as the Wolens case,
 9    tried to impose obligations beyond the contract and that's
10    where it leaped over outside and reflected an effort to affect
11    the prices or the routes or the services.
12            So the mere fact that a claim is denominated, whether a
13    contract or defamation, for example, defamation claims, very
14    typically are not preempted with a few exceptions, and in the
15    cases that we cited, for example, Alaska Airlines case, breach
16    of contract and fraud found not preempted because it wasn't
17    entering into an area that was what the ADA sought to preempt.
18            Taj Mahal case, the Third Circuit case from 1998, the
19    travel all over the world case that I mentioned, the 7th
20    Circuit case from 1996, those cases have those similar types of
21    common law claims that we assert here that were not preempted
22    because at the end of the day, what was really behind those
23    claims wasn't something that truly touched upon the relate to
24    language of the preemption clause.
25            A good example of that is, again, in the Branche case.
```

 1    It was a whistleblower case.  A whistleblower case having to do

 2    with an employee who was fired because he reported that there

 3    were some safety violations on the aircraft.

 4          And the Eleventh Circuit said, you know, this was a

 5    close call but at the end of the day, this is not where those

 6    airlines compete and, therefore, we are not going to preempt

 7    the claim.

 8          So I say this because it's not just the label.  I think

 9    that what the defendants have done is really try to take

10    advantage of categories, if you will, that are either

11    historically preemptive or not preemptive and simply say, it

12    touches upon price, routes or services.

13          I dare say there is probably not a type of claim I

14    couldn't link to price, routes or services just by using very

15    general descriptions, but that's where the Court has to go a

16    little bit further and say, what's really going on here.  And

17    when you look at our complaint, I think you will walk away with

18    the impression that this really is not the run-of-the-mill tort

19    claims that we are asserting, run-of-the-mill conspiracy

20    claims.  These are all claims that are tied to the protection

21    of our mark.

22          There is not a case that Despegar has cited -- because

23    it doesn't exist -- that says that protecting your trademark is

24    going to be covered by ADA preemption.  Those cases do not

25    exist.  That's why it's important to go a little bit beyond the

```
 1   label and look at how these claims are structured, which is
 2   what those cases like Alaska Airlines and Taj Majal and Branche
 3   has done.
 4        Let's see what is being alleged here.  Is it something
 5   that really is within the ambit of the ADA preemption clause,
 6   and in those cases they found that they were not including a
 7   fraud claim, which traditionally is one of the ones that is
 8   preempted.
 9        THE COURT:  The defamation count, are you saying that
10   that's preempted as well?  Is that what you're arguing?
11        MR. GREENWALD:  The defamation count is a count we
12   brought on the counterclaim.  And defamation is something
13   that's been held as outside of ADA.  They don't have a
14   defamation count.  They liken their claims to defamation
15   claims, but they don't have a defamation count, Your Honor.
16        MR. OCARIZ:  Your Honor, actually, you make a good
17   point.  If preemption was as broad as they would suggest, their
18   defamation claim against American would be preemptive as well.
19   And the reason in their case we haven't argued this because
20   they are basing it on what they claim were slanderous
21   statements in a press release, and in all candor to the Court,
22   those are typically the types of claims because of the way they
23   frame them that do not -- will not be affected by ADA
24   preemption.
25        We submit that is the same with our cases.  These cases
```

```
 1   are -- sorry, not our cases, our claims, our claims in Counts 3
 2   through 7 are really trademark-based claims.
 3         So the analogy is there.  Their defamation claim
 4   doesn't touch upon something that is routes, services or fares,
 5   and just like our counter, our claims, our state law claims do
 6   not touch upon anything that's protected by the ADA preemption
 7   clause.
 8         THE COURT:  Okay.  What are the mechanics of this?  So
 9   if it is preempted under the ADA, then how is this issue dealt
10   with?
11         MR. GREENWALD:  So then they cannot pursue state law
12   claims.  They still have their Lanham Act claim, so the whole
13   questions about protections of their trademark.  Lanham Act is
14   a federal cause of action, therefore, not preempted by a
15   different acts of Congress.
16         The fact is that airline price advertising is regulated
17   by the Department of Transportation, and also for the Despegar
18   entities, all except Despegar USA operate in different
19   countries.  It's regulated by those countries.
20         There are regulations for airline price advertising,
21   but price advertising, which is what their claim is about -- I
22   mean, I don't know how you can read it any other way.  All
23   their claims are about how Despegar advertised American's
24   prices.  Those are preempt.
25         The state law claims, so the unfair competition related
```

1    to the advertising of American's fares, the FDUPTA claim and

2    conspiracy claims are preempted and you should dismiss them,

3    Your Honor.

4           They continue to have the Lanham Act claims.  They're

5    not preempted.  We have other arguments against those.  So

6    that's what I would move onto.

7           I did want to briefly address something Mr. Ocariz said

8    just the way their claim -- he alighted to very important

9    distinction.  He talked about how there was unauthorized use of

10   the trademark.  But their allegation for unauthorized use or

11   infringement is only about Despegar USA.

12          Their claim against all the other Despegar entities

13   throughout Latin America is about advertising the fare and that

14   the fare was somehow displayed not correctly or advertised not

15   correctly.

16          In a statute that says -- so their state law claims all

17   relate to how the fare was advertised.  The statute Your Honor

18   has to consider is a statute that says state law claims that

19   relate to prices are preempted and so these are clearly

20   preempted.

21          THE COURT:  Okay.

22          MR. OCARIZ:  Very briefly, Your Honor.

23          THE COURT:  All right.

24          MR. OCARIZ:  We noted -- to address your question --

25   that federal claims are not preempted.  I don't think there is

```
 1   any dispute there.  That's in Footnote 11 of our brief and we

 2   cited the Court the cases there.

 3           In getting ready for today, quite frankly, we didn't do

 4   the job we should have done with that.  We should have included

 5   Count 5, I believe it is, the conspiracy to violate the Lanham

 6   Act and here is why.

 7           That conspiracy claim is derivative of the Lanham Act

 8   claims which are not preemptive.  So when you have a state tort

 9   law claim that is derivative of a federal claim, there is a

10   case from the Western District of Texas.  It's at 2008 Westlaw

11   354.0345, and I have a copy here for counsel.  I have a copy

12   for the Court if you'd like.

13           THE COURT:  Sure.

14           MR. OCARIZ:  If I may approach?

15           THE COURT:  Sure, yes.

16           MR. OCARIZ:  Thank you.  In that case they were both

17   copyright and Lanham Act claims and the issue arose under

18   preemption through the copyright.  And in Footnote 51 of that

19   opinion, the federal court noted that the state law claims

20   ordinarily would be preempted -- or not preempted.  It's

21   opposite in the copyright context.  And they found that because

22   those state law claims were tied and were derivative of a

23   federal claim, which was not preemptive, that, therefore, that

24   state law claim would not be preempted.

25           That's the same situation here.  So even if the Court
```

```
 1    were to find that ADA preemption applies in this case, I submit

 2    that the conspiracy to violate the Lanham Act would not be

 3    subject to ADA preemption because that is tied to a federal

 4    claim.

 5            THE COURT:  Give me just a moment.

 6            Do you need a moment to review this case or are you

 7    familiar with it?

 8            MR. GREENWALD:  Just a quick review.  It's not about

 9    ADA prevention, it's about copyright preemption.  ADA

10    preemption says state law claims that have to do -- that relate

11    to price -- and their conspiracy claim is a state law claim,

12    doesn't arise under federal law.  There is no federal civil

13    conspiracy so it arises under Florida law, is about false

14    advertising for American Airlines' prices.

15            It is preempted.  All the state law claims are

16    preempted, not to mention the conspiracy claim just doesn't

17    matter.

18            I mean, they have their Lanham Act claim.  We will

19    argue that they haven't pled it properly under 9(b), but it's

20    not preempted.  Their state law claims are preempted and we

21    should move onto the two remaining federal claims.

22            THE COURT:  Okay.  Having considered the pleadings and

23    the argument from both sides, I am going to grant the motion to

24    dismiss.

25            I do find that the allegations contained in the state
```

```
 1   law claims included in the conspiracy are all preempted by the
 2   ADA.  These are all issues that are regulated and as such are
 3   not appropriately brought in this action.
 4         I do find that this case I was just presented, the
 5   Expel Technologies Corp. versus American Filter Film
 6   Distributors and all, cited at 2008 Westlaw 354.0345 is
 7   distinguishable because in that case in the footnote it
 8   specifically references the copyright act claim.  It was not
 9   the same type of case as the instant case, so I will grant the
10   motion.
11         Now remaining, the argument remaining in the other two
12   counts.
13         MR. GREENWALD:  Thank you, Your Honor.
14         So I will move onto the false advertising claim, the
15   Lanham Act false advertising claim, Count 1.  And our argument
16   here is not that the Court should dismiss with prejudice, but
17   simply the Court should dismiss without prejudice for failure
18   to plead with particularity.
19         THE COURT:  Let me just ask American.  So you've got
20   all of this information leading up to the counts, but then when
21   you get to the count, you know, for example, in paragraph 79,
22   there is a vague reference to the information described above,
23   and, you know, there is references in 81 and 82 regarding
24   representations, but you don't -- while you broadly incorporate
25   all the paragraphs, it seems not to comply with Rule 9.  I
```

1  think you have to at least identify the paragraphs you are

2  talking about if you are not going to specifically identify the

3  specific statements or misrepresentations.

4       MR. OCARIZ:  Yes, Your Honor.  Two quick points on

5  that.  First of all, what we have identified in the complaint,

6  and if you go through the section before you get to the counts,

7  we very specifically identify right from the outset all of the

8  facts that we know at this point.  Remember, we are at the

9  pleading stage.

10      The only discovery we had related to jurisdictional

11 discovery, but everything else, which is what defendants want

12 under the Rule 9(b), the who, what, where, when, why, those

13 kind of things, we don't know yet.  All we know is the outcome,

14 what we saw on their website, what we saw being done.

15      When they started displaying those things, we don't

16 know.  Which customers were victimized by their conduct, we

17 don't know.  When these entities got together and decided to do

18 this, we have a sense but we don't know for sure.  So that's

19 why we cited the Court to the Hecker case, and the Hecker case

20 stands for the proposition that when the facts, if you will,

21 the underlying facts that support the claims are uniquely

22 within a defendant's possession, then we don't need to do

23 anything more under Rule 9(b).

24      We have set forth quite a lot of detail based on what

25 we know at this point.

1          We know that they were shifting bookings and we have an

2   identification of some of those travel agents because that came

3   through jurisdictional discovery, but they know that.

4          And I would note that it's a little ironic for Despegar

5   to say it needs more detail because it's not able to respond to

6   the complaint when this complaint is almost identical to the

7   first one.  It is identical in facts as to the new defendants,

8   Despegar Ecuador and Despegar Colombia, and the only

9   significant differences in allegations are the allegations as

10  to the parents.

11         THE COURT:  But Judge Altonaga didn't really take up

12  that issue, though.

13         MR. OCARIZ:  No, because it was footnote treatment by

14  them.  And in reality, why is that here?  If they don't

15  challenge every claim, then they have to answer.  So the only

16  argument -- there is no substantive attack on Count 1.  The

17  only attack is we need more particularity and I would

18  respectfully submit that that's because they needed something

19  to keep them from having to answer because then they would only

20  be challenging part of the complaint.  And the rules say if you

21  only challenge part, you have to answer the rest.

22         But when you look -- even if you assume that Rule 9(b)

23  applies and we cited the cases in our briefing that indicate it

24  doesn't apply to Lanham Act claim, the claim in Count 1, but

25  even if the Court says, well, I think it will apply, remember

1   what we are talking about here is not misrepresentations by

2   them to us.  That's the typical case and that's the cases that

3   they cited.  And that's why a defendant under 9(b) needs more

4   notice, because there is an allegation they made a

5   misrepresentation to the plaintiff.  So the plaintiff needs to

6   identify what that was, when it occurred and who made it.

7           That's not our case.  Our case is they were displaying

8   incorrect information on their website that harmed, because it

9   was done in conjunction with American's marks, that harmed

10  American's reputation and goodwill.  So it isn't that they made

11  a misrepresentation to American.  Their conduct in boosting

12  those fares and including a hidden fare and shifting bookings

13  to another agent, that's all conduct and a plan that was

14  devised by them without our knowledge, and that's why when it

15  comes to what they ask for, when did it happen, who was

16  involved, we don't know yet.

17          THE COURT:  Well, I mean, without telling exactly how

18  to do it, I mean, it seems to me you give a broad time period.

19  I mean, you know the contracted period of time from on or about

20  this day to that day, the defendants did whatever.

21          You've got it in your pleadings, at least generally,

22  which you were alleging is generally the misrepresentations.

23          I think even giving you some latitude, I think you

24  either need to reference the paragraph within the complaint or

25  state what they are within the count because I think Rule 9(b)

```
 1    requires it.  So --
 2           MR. GREENWALD:  If I may ask, when you say reference a
 3    paragraph, you mean reference the paragraph in connection
 4    with --
 5           THE COURT:  With the specific statements or
 6    misrepresentations.
 7           MR. OCARIZ:  I'm sorry, Judge, because I am trying to
 8    understand.  There isn't a specific representation to American.
 9    I think that's why I am struggling to understand what the --
10           THE COURT:  But you are saying that they were
11    misleading the public.
12           MR. OCARIZ:  Right.  Let me, if I could step back for a
13    minute and explain.  So they operate an online travel agency,
14    and their sole operation is through the internet.  Their
15    website page is on the internet.
16           So they obtained information from American while they
17    were an authorized online travel agent about the fares, routes,
18    all of those things related to American flights and they post
19    that on their website, just like an Orbitz search or any other
20    online travel agency when you do a search for a flight.
21           So that information pops up.  That's the information
22    that we say wasn't accurate based on the allegations of the
23    complaint.  So they never were doing anything to American, per
24    se, in the context of a misrepresentation.
25           THE COURT:  I understand that, but the whole point is,
```

1    you wouldn't have brought this action if you didn't have some

2    knowledge about the representations that were being made to the

3    public.  That's what I am telling you.

4           If that's the basis of the claims, the remaining

5    claims, then I think you need to state either in the body of

6    the count, what those representations were or reference to

7    their earlier paragraphs that are applicable.

8           MR. OCARIZ:  I understand.

9           THE COURT:  I don't really need to hear any more

10   argument about it, because, you know, I read it.  I see if I

11   understand it just from reading the complaint.  And it wasn't

12   -- although I understood, it's not clear within the counts.

13          MR. OCARIZ:  I apologize, I didn't understand what you

14   were saying.  You just simply want me to go to the counts,

15   reference back the paragraphs when I say as set forth above or

16   something like that?

17          THE COURT:  Exactly.  Right now you are doing a broader

18   all references, but I think you need to be a little more

19   specific.

20          Are you saying that that's not sufficient?

21          MR. GREENWALD:  I just want to address one quick point

22   which hopefully will save us future motion practice when they

23   do amend, which is simply that it's very important that because

24   the way an online travel agency works is to pull fares from a

25   GDS, global distribution service, and display them as they get

1    them from a GDS.

2         American has alleged -- and so American has hundreds of

3    flights and so every day each of these ten different companies

4    pulls those fares for hundreds of flights and displays them.

5         American says that somehow -- and we don't know how,

6    that it didn't display the true fare and they would know what

7    the true fare is versus the fare we displayed.  The only

8    information we get is from the GDS which we then put on our

9    website.

10        We do think the misrepresentation that they claim we

11   made to the public they need to identify for us not the who,

12   because the who is the website, but the what.  What fare was

13   shown by which website, Colombia, Ecuador, Argentina, USA, and

14   how was it false?  How was it a misrepresentation?

15        Without that information, discovery is going to be a

16   mess.  There are literally every day hundreds of fares

17   displayed.  We don't even know --

18        THE COURT:  You are suggesting that they, with that

19   kind of specificity, list -- I mean, you are right.  I mean,

20   there are many transactions.  I mean, for every day within an

21   applicable period of time, you want them to identify that.

22        MR. GREENWALD:  If their claim is every single fare we

23   displayed was false or fraudulent, then they can say that, but

24   I don't think that's their claim.  I think their claim is

25   occasionally we did not display the true fare, not that every

```
 1    fare was -- again, I don't even understand the difference
 2    between a fare that we display because we sold them to
 3    customers at the price we offered them and what a true fare is
 4    being what they would offer on their website.  I don't see how
 5    that can be false, but leaving that aside, we just need to
 6    know -- if their allegation is every single day every fare
 7    offered by Colombia in 2012 was false, that can be their
 8    allegation, but that's not what I see.  And I don't understand
 9    that to actually be their allegation.
10            THE COURT:  Well, you have leave to amend.  You will
11    word it in the best way you think possible to get you past the
12    9(b) issue and we will see where you are.
13            How much time do you need to --
14            MR. OCARIZ:  I think ten days, Your Honor, we should be
15    able to --
16            THE COURT:  Ten days is fine.
17            So does that resolve the defense motion?
18            MR. GREENWALD:  I'm sorry, Your Honor.  There are two
19    more -- there is a false -- there is the trademark infringement
20    against Despegar USA, which our motion is directed at our use
21    of American.
22            They say that because we weren't an authorized agent,
23    whatever that means, that we were infringing or engaging in
24    unauthorized use of their trademark, and we cite cases -- and I
25    think that the Stevo Design case from the District of Nevada
```

1    cited in our brief is very instructive as to how nominative

2    fare use or what's called nominative fare use applies in a

3    trademark infringement claim.

4          Again, not the false advertisement claim, Judge

5    Altonaga found that that's an affirmative defense, but in a

6    trademark infringement claim, if all we are doing is saying

7    here is a genuine American fare that you can book here and we

8    use their trademark just for -- to designate this is American

9    versus AeroMexico, that is fair use, no likelihood of confusion

10   and plaintiffs have not properly pleaded.

11         All they plead is that we said American when we sold

12   genuine American or booked genuine American tickets.  They need

13   to allege more as to what was improper, what was the likelihood

14   of confusion by the public as to the use of the mark.

15         Because if all we are doing is using the AA logo and

16   saying American Airlines when selling authentic American

17   tickets, that is fair use and that does not state a claim.

18         THE COURT:  Okay.  Your response.

19         MR. OCARIZ:  Briefly, Your Honor, yes.  Their defense

20   of nominative fare use does not apply in this case.  It's

21   actually the same one that they raised with Judge Altonaga that

22   she found didn't apply because for fare use to apply, you have

23   to have good faith.  You have to have not done anything more.

24   There can't be any implication of endorsement of sponsorship.

25   And those are all the things that happened here.

1        They say Judge Altonaga's analysis under the prior

2   complaint was different because we didn't plead this additional

3   conduct that is required by the case law, but we did.  The same

4   exact allegations that form part of Count 1 are the ones

5   incorporated into Count 2.

6        But more specific, what is that conduct?  The conduct

7   that we plead is the notion of genuine is the one that needs to

8   occur with nominative fare use, but they weren't posting the

9   genuine fare.  So what was going on?

10       They would download American's fare for a flight, let's

11  say $400.  Then they would take American's logo and put it

12  right next to fare $425.  That's the problem.  They were

13  boosting that fare by $25 separate from their own charges so it

14  wasn't part of their service fees visible to the public.  It

15  was a hidden fee that they made it appear was part of American

16  Airlines' fare, and they did that by using the mark and that's

17  the additional conduct.

18       Why is that important?  Now it implies that American

19  Airlines is sponsoring this fare when it is not because that is

20  not American Airlines' fare.  It implies that American Airline

21  is sponsoring them as an online travel agent to promote this

22  fare, when we don't sponsor them.  We didn't sponsor that fare.

23  And specifically to Despegar USA, Despegar USA was never an

24  authorized travel agent for American Airlines.

25       So where is Despegar getting this information?  From

```
 1    one of their other entities that was an authorized company.

 2         THE COURT:  I am going to cut you off because,

 3    obviously, for this I am limiting myself to the four corners of

 4    the complaint.

 5         I find it's sufficiently alleged.  I think it's more

 6    appropriately taken up in summary judgment.  So the motion is

 7    denied in that respect.

 8         MR. GREENWALD:  I think the Court has dismissed, at

 9    least, temporarily all the claims against the foreign entities,

10    including the parent and the two new foreign entities.

11         So do you want to put off the personal jurisdiction

12    until they have replead?

13         THE COURT:  Any problem with doing that?

14         MR. OCARIZ:  I do, Your Honor, because we have been now

15    pending at the pleading stage for 15 months.  The

16    jurisdictional facts are not going to change based on any

17    rule --

18         THE COURT:  Okay.  Then let's hear argument on that.

19         MR. GREENWALD:  All right.  Your Honor, let's start

20    with the parent.  There are new allegations against the parent

21    and I do think it will be helpful when we get their 9(b)

22    pleadings because right now all we have is this general they

23    advertise fares that weren't the true fare, even though under

24    what Mr. Ocariz just described, the customer gets the ticket at

25    $425 and it's no different than buying a Rice Krispies at a
```

1   store for $4.25 when Kellogg's may want it advertised for $4.

2         But putting that aside, there are new allegations

3   against the parent and then against Ecuador and Colombia, and

4   there is nothing specific about what either any of those three

5   entities did, but let's start with the parent.

6         Under the recent Supreme Court Daimler case, there

7   basically can't be jurisdiction over a parent company that's

8   not physically present here in Florida, and they don't allege

9   Despegar, the parent company is incorporated in Delaware and

10  has headquarters in Argentina, so it can't be general

11  jurisdiction.

12        The allegations make clear that Despegar parent is a

13  holding company.  It doesn't operate the website.  And the

14  specific jurisdiction that's alleged is that the fares were

15  displayed, but the parent doesn't display any fares.

16        THE COURT:  As I recall, they were alleging that the

17  holding company was directing the actions.  Is that right?

18        MR. GREENWALD:  That is what -- that's what they say.

19  There are no factual allegations that the Court can credit, and

20  perhaps we need jurisdiction discovery because there is no

21  facts -- the holding company acts as a holding company.  It

22  doesn't direct the operations and the cases we cite are clear

23  that either for a piercing of the veil or an agency there needs

24  to be complete domination.

25        The holding company needs to be acting rather than

```
 1    simply sharing officers, doing what holding companies do,

 2    setting budgets.

 3         They are not directing the websites and the complaint

 4    does not allege otherwise.  There simply is no personal

 5    jurisdiction over the parent here in Florida based on the

 6    allegations in this complaint.  Especially now that the

 7    conspiracy claims are gone, there is just nothing.  There is a

 8    Lanham Act claim about the operation of websites, websites that

 9    are operated by the individual entities.

10         THE COURT:  Okay.

11         MR. GREENWALD:  Do you want me to continue to Ecuador

12    and Colombia?

13         THE COURT:  Yes.  Why don't you finish your argument

14    and then he will take over?

15         MR. GREENWALD:  Thank you, Judge.

16         So for Ecuador and Colombia, when a person goes to the

17    website and types in Despegar.com, they land at a landing page

18    and it says choose your country of residence, and there are

19    flags.  And a person from Ecuador, a person from Colombia would

20    choose Ecuador or Colombia.  A person from the USA would choose

21    USA.

22         Now, there is nothing that prevents a person from lying

23    and hitting a different place, but the question for the

24    Court -- there is a two-step analysis and we will just focus --

25    we don't believe they have alleged a tort that would meet the
```

1    Florida test, but putting aside the Florida test, the question

2    for the Court is does exercise of jurisdiction over Colombia

3    and Ecuador constitute -- comport with due process and the

4    answer is clearly no, Judge.

5        There is no purposeful availment by Colombia, by

6    Ecuador, of Florida.  They actually do the opposite.  They

7    purposely avoid Florida by telling anyone who comes to the

8    original page, hey, if you are from Florida, go to USA.  Don't

9    come to us.

10       Then they operate -- they are regulated in their

11   countries.  They operate in their currencies.  They simply

12   operate entirely there.  There simply is not purposeful

13   availment.

14       Now, we did look and there are some tiny amount of

15   sales to people who offered either Florida zip codes or Florida

16   area codes for their contact information, and American has

17   found in their frequent flyer data some people who bought

18   tickets who they believe have Florida addresses, but that's not

19   purposeful availment.  The fact that some people sought us out

20   from Florida does not mean that consistent with due process

21   Ecuador and Colombia can be dragged into court in Florida.

22       There is also no minimum contacts.  The Court needs to

23   focus on the specific, not hotels, but on related to

24   advertising airfares.  And there is just nothing in the

25   complaint about what Ecuador and Colombia do related to

1    advertising in Florida.

2         Finally, one fact for the other entities that Judge

3    Altonaga found very important was the manual review of credit

4    card information showing Florida residents were buying from the

5    other entities.

6         But we submit that the record did not support that

7    then, but clearly we have put in front of this court for

8    Colombia and Ecuador a declaration that shows nobody at those

9    entities reviews the credit card information.

10        So if a Florida person, someone who lives here, were to

11   buy through Colombia or Ecuador, nobody at Colombia or Ecuador

12   would know.  There is no reason to believe that's happening

13   because we have this landing page that says, if you are from

14   USA, go to USA.

15        So we submit that for Colombia and Ecuador, it would be

16   inconsistent with due process to exercise personal jurisdiction

17   over those two entities.

18        THE COURT:  Okay.

19        MR. OCARIZ:  If I may approach, what I have done is, I

20   have taken the jurisdiction allegations that existed and put

21   them on this chart comparing them to the jurisdictional

22   allegations in the amended complaint and I also have a third

23   column which is the evidence to support each allegation that

24   came up in jurisdictional discovery.

25        And what you will see from this chart is we made no

 1    different allegations as to Colombia and Ecuador than we did to

 2    the prior defendants.

 3         In fact, we added more relating to Ecuador and Colombia

 4    because it was something that came up in jurisdictional

 5    discovery that we uncovered.

 6         THE COURT:  Is there still jurisdictional discovery to

 7    be had?

 8         MR. OCARIZ:  We have not conducted it as to the three

 9    defendants.

10         THE COURT:  Okay.

11         MR. OCARIZ:  But here is what Judge Altonaga said and

12    there is a very voluminous jurisdictional discovery record with

13    information that was filed under seal because defendants didn't

14    want it in the public since it related to their financial

15    operation.  But Judge Altonaga found, "It is remarkable foreign

16    defendants insisted on pursuing their challenge of specific

17    personal jurisdiction on the basis of the facts gathered in

18    discovery and applicable law.

19         "The requirements for specific personal jurisdiction

20    are amply" -- I will turn the page -- "are amply satisfied

21    under Florida Statute 481.93."

22         Nothing has changed.  The fact that we added more can't

23    mean all of a sudden we have less personal jurisdiction.  It

24    just doesn't make any sense.

25         These two corporations, Ecuador and Colombia, acted no

 1    differently -- we've alleged in the complaint and as the

 2    jurisdictional facts that we have so far have shown -- to

 3    justify any dismissal based on lack of personal jurisdiction.

 4            In fact, what the Despegar defendants didn't mention

 5    today is one of the key reasons for personal jurisdiction was

 6    Louis Vuitton case that came out last year from the Eleventh

 7    Circuit that Judge Altonaga relied on.

 8            In that there were two sales into Florida, just two,

 9    and the Eleventh Circuit said, that's enough.  What information

10    they provided in their motion to dismiss, as a percentage the

11    sales from Colombia and Ecuador represent more sales from

12    Florida than as a percentage it did to the other defendant.

13            So they have conceded not only that the sales, in fact,

14    occurred, which under Louis Vuitton is enough, but in terms of

15    this purposeful availment, the answer to that is simple.  If

16    you don't want a Florida sale, don't take it.

17            But they take it and what we learned in jurisdictional

18    depositions from the parent company representative is that

19    Florida is an important state for this company.  So this notion

20    that there is no purposeful availment is just simply not borne

21    out by the facts we have so far.

22            We think there is enough in this record, based on what

23    we have alleged and what uncovered before, to make a finding

24    that there is personal jurisdiction and purposeful availment.

25            THE COURT:  Okay.

```
1          MR. GREENWALD:  Purposeful availment can't be if you

2    don't want a sale don't take it.  Purposeful means you have

3    acted with a purpose to solicit a sale.  That's the difference

4    with the Louis Vuitton case.  The defendant in that case sought

5    Florida sales and only made two of them, but sought them.

6          Here we actively try and prevent them.  We tell people

7    from Florida, buy at Despegar USA, not Ecuador or Colombia.  It

8    does not and will not comport with due process, so we

9    respectfully suggest that those entities should be dismissed.

10         THE COURT:  Okay.  The motion is denied, but you will

11   be permitted to do some additional jurisdictional discovery as

12   to the three new defendants, and if there is a sufficient basis

13   to revisit the issue, I will.

14         MR. OCARIZ:  Your Honor, if you are denying their

15   motion to dismiss, then I won't need any jurisdictional

16   discovery.  That means that they are in.

17         MR. GREENWALD:  We would suggest that you hold it in

18   abeyance and order jurisdictional discovery and then we can

19   renew the motion.

20         THE COURT:  All right.  That's what I will do.

21         All right.  Are we now ready for the plaintiff's -- I'm

22   sorry, American's motion?

23         MR. FRACKMAN:  My name is Andrew Frackman.  I'm very

24   pleased to be here.  It's a big courtroom so I am moving

25   forward if it's okay.
```

```
 1            I am going to address American's motion to dismiss the

 2   counterclaims, and as the Court knows there are three

 3   counterclaims, two antitrust counterclaims and a defamation

 4   counterclaim.

 5            I am going to start with the antitrust counterclaims

 6   and there are two issues, as you know, from the briefing, Your

 7   Honor.  One is that the counterclaims don't state a claim for

 8   relief under governing Supreme Court law as well as Eleventh

 9   Circuit law, of course.  And the second is that Despegar

10   doesn't have standing to assert the claims.

11            So I am going to move a little slowly.  If the Court

12   wants me to speed up, I will.

13            THE COURT:  Well, I am running out of time.

14            MR. FRACKMAN:  The reason I want to move a little

15   slowly -- it won't be that slow, certainly not compared to the

16   discussion we have had so far.  It will be quick, relatively

17   speaking.

18            The reason I wanted to take a little bit of time, a

19   couple of minutes, is because these antitrust claims and

20   antitrust jurisprudence sometimes presents some confusions.

21            This case is not a confusing case.  It's not even a

22   difficult case.  Now that we have the briefing, we know what

23   Despegar's antitrust claim is.  It is what is called a

24   unilateral refusal to deal claim.  They claim that American is

25   refusing to deal with them.  It's a claim that is brought under
```

```
 1   Section 2 of the Sherman Act and, as the Court knows, there is
 2   Section 1 of the Sherman Act that deals with agreements and
 3   restraint of trade, including conspiracies and contracts, and
 4   there is Section 2 of the Sherman Act, which deals with conduct
 5   of single firms.
 6        And the law is well-developed that for the most part
 7   the antitrust laws don't care about the conduct of single
 8   firms.  The only time they care about the conduct of single
 9   firms is when those firms have sufficient market power,
10   monopoly power, so that individually they can affect the proper
11   operation of the market, which means that they can raise
12   prices.  That's what it's really about.
13        So this is a Section 2 claim that American -- that
14   American's refusal to deal is unlawful.
15        In order to state a Section 2 claim, they have to
16   allege that American is a monopolist somewhere in some market.
17   Otherwise, they can't even get off the starting blocks.
18        And they have alleged that American is a monopolist in
19   specified markets.  And in antitrust jurisprudence, it's all
20   about the right markets and the effect on those markets.
21        And the markets that they contend American is a
22   monopolist or a near monopolist in are specific air travel
23   markets, air travel routes between specific cities called city
24   pairs in air transportation lingo.
25        They claim that we had a monopoly or near monopoly in
```

1   those city pair routes and, consequently, our refusal to

2   distribute through Despegar somehow enhanced or maintained that

3   monopoly, which means that they have to be saying that our

4   refusal to distribute through them made it possible for us to

5   raise prices on those city pair air travel routes, where

6   otherwise we wouldn't be able to do so.

7          Now, with that little bit of background --

8          THE COURT:  I guess my question is with the background

9   and considering the briefing that was done, why isn't this

10  better left as a summary judgment issue as opposed to a --

11         MR. FRACKMAN:  That is a fair question, Your Honor, and

12  the Supreme Court really has addressed this in the antitrust

13  context in Twombly, in particular, and in the other cases since

14  then.

15         The antitrust laws are a very particular type of

16  business tort and they are a tort created by statute.  They

17  have tremendous in terrorem effect, huge litigation burden.

18  They tend to be large.  They tend to be very expensive to

19  defend.  You get attorney's fees if you prevail, and as a

20  consequence, the Supreme Court has recognized that in these

21  types of cases, more so than in your normal breach of contract

22  case, it is essential for the district judge to perform its

23  gatekeeper function and not to allow claims that really have no

24  merit to get going and to impose that in terrorem burden and

25  litigation burden on the defendant or the counterclaim

1    defendant in this case.  That's why it's appropriate here.

2         If the Court understands the nature of the claim, the

3    Court will understand that it has absolutely no logic or merit

4    from an antitrust standpoint.  It has nothing to do with

5    restraint of competition and the only markets that matter in

6    this case, which are the air travel markets between the

7    specified city pairs.

8         Now, you might ask, well, why is that the case?  How do

9    we know that from the pleadings?  We know that because Despegar

10   does not participate in those air travel markets.  It doesn't

11   provide jet service.  It doesn't offer seats.  The way a

12   monopolist affects competition in specified markets is by

13   raising price or lowering output or preventing new entrants

14   from coming in and increasing output.

15        None of that has anything to do with Despegar because

16   Despegar is not a rival.  It's not an airline.  It's a

17   distributor and it operates in a completely different market.

18        And the case that is totally clear about this is the

19   leading Section 2 refusal to deal case, Aspen Skiing.  We know

20   the jurisprudence is very clear here.

21        In that Supreme Court case, the Court narrowly

22   circumscribed the circumstances under which a party can bring a

23   Section 2 claim alleging a refusal to deal, and it said the

24   only time you can do that where it will violate Section 2 is

25   where you are a rival.

```
 1                In Aspen Skiing Co., Aspen Skiing, the ski co. that

 2       opened the three of the four mountains in Aspen, refused to do

 3       business with the fourth mountain.  That was a proper Section 2

 4       refusal to deal claim because Aspen Highlands, the fourth

 5       mountain, was a rival, was a competitor.

 6                That's not the case here.  Despegar is not a rival in

 7       the markets that matter, the air travel markets between

 8       specified city pairs.  It's not a competitor in those markets.

 9       It is not a competitor at all.  It is a distributor, a totally

10       different fact pattern.  And claims by distributors.  Like this

11       one, for a unilateral refusal to deal do not state a claim

12       under Aspen.

13                That is why it's appropriate here.

14                And moreover -- appropriate to dismiss here.

15                And moreover, Your Honor, even if -- well, another

16       reason it's totally appropriate to dismiss is the notion that

17       the elimination of a downstream distributor will increase --

18       will decrease competition in the air travel markets is totally

19       frivolous because what does that mean when you parse through

20       all the language in that lengthy counterclaim?

21                What they are saying is by refusing to distribute

22       through Despegar, American Airlines is increasing its monopoly

23       power in these specified air travel routes so that we can raise

24       prices there to the detriment of the air traveling consumers.

25                But if we are not selling through this large online
```

```
 1    travel agent, it means that we are distributing less

 2    effectively.  That means that our competitors who can

 3    distribute through Despegar have an advantage over us.  We are

 4    giving up that advantage, that distribution network, the

 5    largest in Latin American, apparently, South America, because

 6    we don't want to do business with them because they violate our

 7    relationship terms.

 8            But that doesn't decrease competition in the air travel

 9    markets.  It increases it because it gives an advantage to our

10    airline competitors.  This is not an antitrust claim that has

11    any sense for that reason.

12            I wanted to turn to one other point, though, if I

13    could, Your Honor, to emphasize why this -- this is an

14    antitrust claim.  This is a dog that will not hunt.  It cannot

15    state a claim under Aspen Skiing, but there is a related point

16    here which has to do with standing.

17            Let's assume for a moment that the claims -- the

18    allegations stated a claim for relief which, as I said, it

19    can't because of the nature of the claim being a unilateral

20    refusal to deal claim.

21            Even if you were to hold that there is some plausible

22    monopoly violation there, the claim -- the counterclaim should

23    be dismissed because Despegar doesn't have standing to assert

24    them.

25            Now, antitrust standing is also a whole long story that
```

```
 1      I am not going to burden the Court with.  It's in our briefs,

 2      the cases, but there is one key point that the Court should

 3      keep in mind with respect to antitrust standing.

 4              Under the antitrust laws, the Supreme Court precedent

 5      and the Eleventh Circuit precedent, at a minimum in order to

 6      have antitrust standing to bring a claim under the Sherman Act,

 7      the plaintiff or the counter-claimant here must have suffered

 8      antitrust injury, that is competitive injury.  It's not just a

 9      tort.  It's competitive injury.

10              I will give an example that might help illustrate this

11      in a simplified form.  Let's assume you had an automobile

12      manufacturer and it had a competitive automobile manufacturer

13      and that competitor bought transmissions from a transmission

14      manufacturer and the first defendant car manufacturer blew up

15      the transmission manufacturer, which prevented the other car

16      manufacturer from competing.

17              It's clear that the car manufacturer that no longer

18      could compete because it didn't have transmissions could assert

19      an antitrust claim under Section 2, attempted monopolization,

20      but the transmission firm couldn't.  It doesn't operate in the

21      market that is relevant in that case, the manufacturing of

22      cars.

23              It manufactures transmissions.  It may have other

24      claims against the defendant, trespass, destruction of

25      property, maybe some other state law claims but it doesn't have
```

1    a Sherman Act claim because it hasn't suffered injury to

2    competition of the sort that is needed for an antitrust claim

3    in the Eleventh Circuit.

4           These are the reasons why it is appropriate -- it is

5    not only appropriate, it is essential under Twombly to look at

6    these antitrust claims very carefully on a motion to dismiss to

7    exercise the gatekeeper function and not to permit claims that

8    really haven't -- they cannot state a claim under Aspen.  They

9    cannot state a Section 2 claim.

10          I want to make one other point.  It's essential for the

11   Court not to permit that to go forward under the instruction of

12   the appellate courts.  There is one other point related to the

13   standing issue that I want to just bring to the Court's

14   attention before I end.

15          They cite a lot of standing cases under Section 1 of

16   the Sherman Act and, as I said, Section 1 deals with contracts

17   or agreements in restraint of trade.  It's completely different

18   from Section 2 which deals with monopolization or attempted

19   monopolization.

20          The cases they cite for the most part are what we call

21   dealer distribution -- dealer termination cases.  Those are

22   cases where a dealer distributor is the plaintiff and the

23   distributor claims, either directly or implicitly, that his

24   competing distributors have persuaded the manufacturer to cut

25   him out, and by cutting him out, it reduces competition in the

```
1    relevant market in those cases, which is the distribution

2    market.  There is one less distributor and, therefore, that

3    distributor in that type of Section 1 distribution case, indeed

4    has standing.  That has nothing to do with the facts here.

5    This is not a Section 1 case.

6          Despegar is not alleging that we, in collusion with

7    competing distributors, have refused to deal with Despegar in

8    order to decrease competition in the distribution market.  We

9    don't even participate meaningfully in the distribution market.

10   We certainly have no monopoly power in the distribution market

11   and this is a Section 2 claim.

12         The only markets that are relevant are those that we

13   have alleged market power or monopoly power in.  The

14   distribution market, even if they could allege that there was

15   some reduction in competition, has nothing to do with a

16   Section 2 claim.

17         It might if it were a Section 1 claim and they were

18   arguing that we were colluding with their competitors to reduce

19   competition in the market in which they compete, but that's not

20   their claim, not even close.

21         THE COURT:  I am going to have to cut you off.

22         MR. FRACKMAN:  Could I just turn one moment to

23   defamation?

24         THE COURT:  Briefly.

25         MR. FRACKMAN:  The defamation claim is much simpler to
```

1    address, Your Honor, and there are two or three points here

2    worth mentioning.

3         The first is Despegar is a big corporation, big

4    company, the largest online travel agent, according to them, in

5    Latin America.  They are not a private figure.  They are a

6    public figure, certainly for purposes of this dispute and

7    therefore, since they are a public figure, they have to allege

8    actual malice to support their defamation claim, which they

9    haven't done.

10        Second, the allegedly defamatory statements are two

11   press releases that were issued on -- one on July 31st and one

12   on August 1st, the day American filed the complaint.  The

13   statements that are allegedly defamatory in those two press

14   releases are all encompassed by the allegations of the

15   complaint.

16        Now, why do I mention that?  Well, first of all, the

17   Court knows that in the pleading itself, anything we say is

18   absolutely privileged.  It's not actionable.  So we are talking

19   about a 24-hour time gap before -- between the allegedly

20   defamatory statement and the time when we have a totally

21   privileged recitation in the pleading of exactly the same

22   facts, you need much greater facts.

23        So this is a very marginal claim in that respect, but

24   more to the point, had the press releases been issued

25   simultaneous with the filing of the complaint, much less a

1  minute or two later, there would be no question at all that

2  those statements would be qualifiedly privileged under Florida

3  Supreme Court precedent, because statements concerning a

4  litigation are qualifiedly privileged.

5       And if qualifiedly privileged, they would have to

6  allege actual malice, which they haven't done.  So their

7  argument has to be merely because of the fortuity and timing

8  that the press releases had to go out the day before the

9  pleading was filed, we lose the qualified privilege that would

10 otherwise attach.

11      That is not a sensible position for the following

12 reasons:  First of all, the termination of Despegar had

13 occurred on the 31st.  They allege they have millions of

14 customers, certainly tens and tens of thousands, trying to book

15 American tickets through them.

16      We had to provide an explanation to the public because

17 of their public role as to why we were terminating them.  The

18 fact that we had to make that statement and couldn't get the

19 complaint filed until the next day should not affect the

20 fundamental analysis for the Court which is whether these

21 statements are sufficiently tied to the litigation and the

22 dispute in litigation so as to be qualifiedly privileged.

23      THE COURT:  All right.  Counsel, I will give you one

24 minute.  This is well briefed.

25      MR. FRACKMAN:  I am done, Your Honor.  Thank you very

1    much.

2           MR. OLSON:  Thank you, Your Honor.  Steig Olson for

3    Despegar on the antitrust claims.

4           THE COURT:  So tell me, why does the antitrust claim

5    ultimately make any sense because, as American says, if

6    anything, this hurt them in the market as opposed to helping

7    them?

8           MR. OLSON:  Yes, Your Honor.  The antitrust claim makes

9    sense because Despegar USA is the principal target of a scheme

10   by American Airlines that's designed to diminish price

11   competition and price transparency in the relevant markets.

12          As we have alleged in the complaint, Despegar is the

13   key entity that provides the robust type of price transparency

14   and competition in these markets which generally are Latin

15   American markets.

16          We took pains, Your Honor, to explain how our claim

17   makes sense, often by quoting American's own executives.  So,

18   for example, we quoted their chief financial officer who says

19   the problem for us is that OTAs like Despegar provide, quote,

20   complete price transparency to travelers, and in that new

21   environment that was brought about by entities like Despegar

22   USA, American finds it difficult to compete.

23          So American's goal is to either cripple the business of

24   Despegar and entities like it, or to force those entities to

25   accept a new model of distribution that American alone is

1    pushing into the market because it finds it difficult to

2    compete on the merits that will diminish the ability of online

3    travel agencies to present the type of robust price

4    transparency and competition in the market that travelers

5    demand.

6            And if you look at paragraph, for example, 83 and 84 of

7    our complaint, again, we took pains to explain exactly how this

8    works.  And Your Honor is correct that this is really a

9    fact-intensive antitrust claim.  I must disagree with

10   American's counsel's who suggests there is some guidance that

11   fact-intensive antitrust claims should be resolved at the

12   pleadings stage.  In fact, the Eleventh Circuit has repeatedly

13   said quite the opposite.  We cite two cases on page four of our

14   brief.

15           Now, American's goal in this scheme that we have laid

16   out painstakingly in the complaint is very clear.  It's

17   attacking Despegar as the very meanings to diminish this price

18   competition and transparency.

19           This is not new.  This is another element, which,

20   again, we have plead which shows that this is not some made up

21   fabrication.  We have seen this before.  First, American did it

22   in the US markets.  First American targeted Orbitz and Expedia

23   and Priceline back in 2010.  It did the very same things that

24   we are seeing here today.  It pulled its fares from Orbitz

25   sending its financial situation plummeting, putting it on the

 1   brink of financial ruin, and it used that as a way to coerce

 2   Orbitz into accepting the type of new distribution model that

 3   does not allow this type of robust price competition

 4   transparency to be presented.

 5        After showing the market what it could do to Orbitz,

 6   Expedia and Priceline, which had both said, and again, we have

 7   quoted in our complaint, what American is pursuing is bad for

 8   competition, and it's bad for travelers.

 9        Both of them ultimately were coerced into accepting

10   this new model that American now wants to impose on Despegar,

11   and then American did the same thing that brings us all here

12   today, it filed a federal court lawsuit against Orbitz.  Again,

13   we see that pattern replicated here today.

14        Now, Your Honor, we submit in addition to the fact that

15   these are fact-intensive issues, that on the legal front there

16   are two Supreme Court cases that decisively resolve the types

17   of arguments that American has made today, almost as if they

18   had anticipated them.

19        The first of those cases is the Blue Shield of Virginia

20   versus McCready case.  Now, when American filed its opening

21   brief in this case, it said, even though Despegar clearly

22   alleges it was the principal target and the very means of

23   American putting the scheme into place, it doesn't have

24   standing because of the fact that because Despegar can't

25   technically take title to tickets, it's not technically a

 1   competitor or a consumer in the relevant markets.

 2          Fortunately, for us, as we point out to the Court, the

 3   Supreme Court had rejected precisely that argument 30 years

 4   ago.  If you look at page 472 of the Supreme Court's decision,

 5   it says, "The act is comprehensive in its terms of coverage and

 6   the statute does not confine its protection to consumers or to

 7   purchasers or to competitors or sellers."

 8          And the Supreme Court went on to say, "When the

 9   plaintiff, the claimant is targeted as the very means to

10   implement an anticompetitive campaign and when the harm to the

11   plaintiff is inextricably intertwined with the anticompetitive

12   campaign," which, of course, is what we have alleged here, "the

13   plaintiff has standing."

14          So by American's reply brief and by its presentation

15   today, it had to come up with a more complicated argument which

16   was described aptly by the leading antitrust treatise that we

17   cited in our complaint, the Hovenkamp Treatise, as the type of

18   overly lawyered approach to antitrust cases that does not

19   really have a reflection with reality and we would, in fact,

20   encourage the Court to look at that treatise section we cited

21   because it actually uses a travel agency like Despegar as an

22   example where this very type of overly lawyered argument does

23   not succeed.

24          So, American's new argument is, oh, maybe you don't

25   have to be a competitor or a consumer in that market, but if we

1    very narrowly define the antitrust markets and slice them up

2    extremely thinly so now we are talking about an argument for

3    air travel versus an argument for ticketing air travel, that's

4    how thinly they are slicing them up, if the plaintiff is harmed

5    in one market but not the one that the monopolist monopolizes,

6    then you don't have standing.

7         Fortunately for us again, McCready had anticipated and

8    rejected this identical argument, and that's in Footnote 21 of

9    its brief where it gave an example where the Supreme Court

10   said, of course there would be standing.  This example bears a

11   remarkable similarity to the example, the hypothetical that

12   counsel gave today.

13        This is the Supreme Court's words, "If a group of

14   psychiatrists conspired to boycott a bank and until the bank

15   ceased making loans to psychologists, the bank would no doubt

16   be able to recover the injuries suffered as a consequence of

17   the psychiatrist's actions.

18        And then the Supreme Court proceeds to say, and that's

19   the case even though the bank's injury is felt in a different

20   market than the psychiatrists are trying to boycott.  So

21   McCready definitively rejects these same arguments today.

22        I will just cite the cases where the Eleventh Circuit

23   has done the same because I know time is short.

24        The Construction Aggregate case at page 764 cites

25   McCready to make this exact point.  It rejects the argument

1    made to date that only one discrete sector of the market may be

2    a target for a particular competitive act and the Eleventh

3    Circuit says, nothing in our cases, however, require such a

4    narrow interpretation of the target area tests and explains

5    that McCready just rejected this exact argument.

6         And the DeLong Equipment case from the Eleventh

7    Circuit, a 1993 decision, does the same along with the

8    treatise.

9         Now, the second Supreme Court case, which is really

10   dispositive here, Your Honor, particularly at the pleading

11   stage, is the Aspen Skiing case.  In their papers, American

12   suggested that this case has been somehow heavily criticized by

13   courts, a very remarkable proposition given that it's a Supreme

14   Court precedent that has stood for 30 years that the Supreme

15   Court has revisited multiple times, included in the Trinko

16   case, including the LinkLine case and has not criticized or

17   overturned, but has affirmed the decision.

18        And the Supreme Court said in that decision that when a

19   monopolist refuses to deal with the market participant, quote,

20   as a purposeful means of monopolizing interstate commerce, this

21   is prohibited by the Sherman Act.

22        The Trinko decision from 2004 said here the factors

23   that you need to plead to plead a refusal to deal case.  One,

24   that the defendant made a decision to cease participating or

25   dealing with the plaintiff.  We have clearly alleged that here.

```
1          Second, that this was a unilateral termination of a
2     voluntary and profitable course of dealing.  That's exactly
3     what happened here.
4          Third, that the defendant, here American, has shown a
5     willingness to forsake short-term profits.  That's significant
6     because it shows that what their long-term goals and
7     anticompetitive one, again, we squarely allege that here.
8          And fourth, that the alleged defendant monopolist was
9     unwilling to deal at the prevailing retail price, which again,
10    goes to the anticompetitive goals.
11         Again, we squarely allege that here because it is the
12    case.  Despegar is willing to deal at the same price that
13    American deals with others.  In fact, a better price, American
14    is refusing as part of its scheme.
15         THE COURT:  I am going to cut you off, but the
16    defamation count briefly.
17         MR. OLSON:  Your Honor, if I may, just turn that over
18    to Mr. Greenwald and he will be very brief.
19         MR. GREENWALD:  I can address it very quickly, Your
20    Honor.
21         It shouldn't be resolved on the pleadings.  Our
22    pleading pleads defamation, but their defenses, which are
23    factual and outside the pleadings, are also just wrong.
24         I mean, we were a private figure and they issued a
25    press release.  There was no public dispute.  They just went
```

1     and issued a press release.

2            If we were a public figure, then every business was a

3     public figure on the day they issued the press release.

4            Qualified immunity, the Florida courts offer qualified

5     immunity when a lawyer is going to investigate a claim that's

6     filed in court and he or she should be able to discuss the

7     claim with witnesses.  That's what the qualified immunity, not

8     for issuing a press release.

9            And then we do plead malice.  So they are just wrong on

10    every count on the defamation and the Court should not dismiss

11    it.

12           THE COURT:  All right.  I am going to deny the motion

13    to dismiss the counterclaim as to both issues as I find that

14    they are sufficiently plead.  I think these are appropriate and

15    would appropriately be handled at summary judgment as opposed

16    to the motion to dismiss stage.

17           How much time do you need to answer the counterclaim?

18           MR. FRACKMAN:  Three weeks will be sufficient.  With

19    the holidays, three weeks will be sufficient.

20           THE COURT:  We will give you 20 days.  If there is an

21    issue with that timing, you can just discuss it with counsel

22    first and then bring it to me.

23           Anything else for today?

24           MR. OCARIZ:  Just one quick housekeeping matter.  When

25    you initially asked me about amending the complaint I had said

54

```
1    ten days, but then since Your Honor is now holding the personal

2    jurisdiction in abeyance, can I have ten days until you issue

3    your ruling on personal jurisdiction, so we deal with one

4    pleading one time?

5            THE COURT:  Any problem with that?

6            MR. GREENWALD:  Yes, Your Honor.  We would ask -- we

7    may withdraw our personal jurisdiction claim.  They should

8    amend and then we will either re-interpose it.  We should just

9    move forward on discovery at this point and set the pleadings

10   would be my suggestion.

11           THE COURT:  Yeah.  Unless you can give me a pretty

12   definitive amount of time needed for jurisdictional discovery,

13   I prefer just to move on.

14           How long do you think that's going to take?

15           MR. GREENWALD:  Look, jurisdictional discovery is going

16   to show the same thing that was shown for the other defendants,

17   although we think that Judge Altonaga got it wrong in terms of

18   what credit cards received, but if your court is going to apply

19   the same logic and the same due process analysis, even though

20   we have the website that says, American, Floridians don't come

21   here, even if the Court is going to follow Judge Altonaga's

22   reasoning and saying that comports with due process, I will

23   discuss with my client, but I don't know that we will continue

24   to press it.

25           Jurisdictional discovery is not going to show anything
```

1   new except as to the parent.  I still don't even understand

2   what the parent has done to engage in any actions.

3         THE COURT:  All right.  I will make it simple.  You

4   asked for ten days.  I will give you 30 days and that's more

5   than enough time I think considering there has been substantial

6   discovery already to, one, find out what the defendants are

7   going to do, and two, to see where you are.

8         MR. GREENWALD:  Thank you, Your Honor.  We appreciate

9   it.

10        MR. OCARIZ:  Thank you, Judge.

11        THE COURT:  All right.

12        (Proceedings concluded at 2:50 p.m.)

13

               C E R T I F I C A T E

14

15      I hereby certify that the foregoing is an

16   accurate transcription of the proceedings in the

17   above-entitled matter.

18

19

20   December 23, 2014     /s/Patricia Diaz
    DATE                PATRICIA DIAZ, FCRR, RPR, FPR,
                       Official Court Reporter

21                  United States District Court
                       400 North Miami Avenue, 11th Floor

22                  Miami, Florida 33128
                       (305) 523-5178

23

24

25